EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,
Plaintiff–Appellee,

v.

WATERGATE AT LANDMARK
CONDOMINIUM, Defendant–
Appellant.

No. 93–1723.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 9, 1994.

Decided May 24, 1994.

**ARGUED:** William Frederick Causey, Jackson & Campbell, P.C., Washington, DC, for appellant. Samuel Alan Marcosson, Office of General Counsel, Equal Employment Opportunity Commission, Washington, DC, for appellee. **ON BRIEF:** Scott Alton Mills,

Jackson & Campbell, P.C., Washington, DC, for appellant. James R. Neely, Jr., Deputy Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Vincent J. Blackwood, Asst. Gen. Counsel, Office of Gen. Counsel, Equal Employment Opportunity Commission, Washington, DC, for appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge PHILLIPS wrote the opinion, in which Judge MURNAGHAN and Senior District Judge JOSEPH H. YOUNG joined.

## OPINION

PHILLIPS, Circuit Judge:

The Equal Employment Opportunity Commission (EEOC) brought an action against Watergate at Landmark Condominium (Watergate) alleging that Watergate discharged a 63 year-old employee, Melvina Nozick, on the basis of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. (ADEA). A jury found that Watergate had violated the ADEA, and that the violation was "willful" thus warranting the award of liquidated damages under the statute's section 7(b). On this appeal, Watergate challenges the sufficiency of the evidence to support the jury's finding of willfulness and the district court's admission of evidence of remarks demonstrating age bias made by two condominium residents. We affirm.

### I

In 1976, Melvina Nozick was hired by the then recently opened Watergate, a condominium association in Alexandria, Virginia. Watergate is a large complex, consisting of 1,400 units housing approximately 3,500 residents.[1] Nozick was hired by Watergate to establish a racquet sports program; she was named Director of its tennis facilities, known as the Racquet Club, and served as the Tennis Professional. In 1989, while still holding those positions, she became a resident of Watergate.

During that same year, 1989, Watergate's Recreation Committee, in conjunction with an ad hoc Tennis Committee, decided that the Racquet Club needed to be "reorganized" and "rejuvenated". Both committees were small, volunteer committees comprised of Watergate resident unit owners (residents). David Cearnal was Chairman of the Recreation Committee and a member of the Tennis Committee. The committees' decision followed a survey of Watergate residents that revealed a concern by some that having the same person serve as manager of the Racquet Club and as tennis pro caused a conflict of interest with respect to the scheduling of court time by the pro for lessons at times when residents may have wanted to use the courts for their own play.

In January 1990, Cearnal, on behalf of the Recreation Committee, proposed to Watergate's Board of Directors (the Board) that the Racquet Club be reorganized. Management of Watergate was entrusted to the Board; like the Recreation Committee, the Board was comprised of resident volunteers. While the Board exercised ultimate control, authority to make employment decisions for the condominium was delegated to a general manager, a position held at all relevant times by Petrine Squires. Unlike the Board members, the general manager was neither a resident nor a volunteer, but rather a paid employee of Watergate. The Board also

---

1. "The major characteristics of a condominium are individual ownership of a unit or apartment; an undivided interest in certain designated common elements that serve all the units in the condominium; and an agreement among the unit owners regulating the administration and maintenance of the property." Warren Freedman and Jonathan B. Alter, *The Law of Condominia and Property Owners' Associations* 21 (1992). Condominiums function as private residential governments with the unit owners electing a board of directors to conduct the entity's business and social affairs. "However, since the directors who make the rules are elected by the owners, tyrannical directors can be voted out of office." Jesse Dukeminier, *Property* 965 (2d ed. 1985). Which is to say that a condominium's board of directors must be responsive to resident wishes, in the same way that corporate directors must ultimately be responsive to shareholder wishes, and elected public officials to their electoral constituency's wishes.

functioned through various volunteer residents' committees; among these committees was the Recreation Committee.

Instead of acting directly on Cearnal's reorganization proposal, the Board chose to establish an ad hoc Reorganization Committee. In addition to being Recreation Committee Chairman, Cearnal was also appointed to the Reorganization Committee. After several months, the Reorganization Committee reported back to the Board. In April 1990, based on the Committee's recommendations, the Board decided to separate Nozick's dual role as manager and tennis pro, and establish a "new" job which would be exclusively managerial. Nozick made clear that she was willing to forego her role as tennis pro, and the concomitant income, in order to continue as manager of the Racquet Club.

Because the Board considered the manager's job a "new" position, it denied Nozick a right of first refusal. However, neither the Board, nor Watergate manager Squires could identify a single job duty or responsibility to be performed by the holder of the "new" position which Nozick had not already been performing. Once the Board decided that Nozick would not automatically continue as manager of the Club after the reorganization, responsibility for deciding who would fill the position fell to Squires. She in turn delegated the initial winnowing process to another Watergate employee, Vicky Paulson, the complex's Activities Director. From 30 or 40 applications, a group of three candidates was culled: Nozick, then 63 years of age; Christina Moore, age 23; and Suzanne Rutt, age 28.

During late August, the finalists were interviewed by a three-person Interview Committee consisting of Manager Squires, Activities Director Paulson, and David Cearnal who, as indicated, was the Chairman of the Recreation Committee, a member of the Reorganization Committee, and the sole resident on the Interview Committee.

The interviewers rated each of the candidates. Nozick received the highest scores from both Paulson and Squires, and the high-

est overall rating. Cearnal rated Nozick last. During her interview, Nozick was told that the new Manager would not be able to give private lessons, or to use the facilities at the Club. There was evidence presented at trial that other candidates were not informed of these rules. Nozick was told that these prohibitions would apply to her even though she was a resident of Watergate. When Nozick protested, Squires said she would check with the Board and report back to her. After the interview, but before a decision was made, Nozick and Paulson and Squires discussed salary. Squires had budgeted $25,000 for the position, an amount which suited Nozick. Subsequently, Paulson asked Nozick if she would accept $24,000. Nozick consented. Finally, Nozick was asked if she would take $22,000. Nozick again consented.

On August 25, 1990, Nozick wrote Squires a letter informing her that although she was willing to forego using the tennis facilities for teaching purposes, she did want to "reserve the right to use the facilities on a personal basis on my *own* time." J.A. 309.

On August 28, 1990, the Board voted not to permit the Racquet Club manager to use the facilities.[2] Squires asked Paulson to inform Nozick of the Board's decision. Nozick, who at the time was in New York City attending the National Tennis Conference, had left with Squires two phone numbers where she could be reached. Paulson placed two calls, both of them to wrong numbers.

On August 30, Squires offered the manager's job to the 23 year-old Christina Moore. After initially accepting the job, Moore declined upon learning that she would not be able to use the courts on her own time. Upon Moore's resignation, Squires decided to offer Paulson, age 41, the position, at a salary of $24,000. Before doing so, she did not inquire whether Nozick would accept the job with the restrictions. Paulson accepted the position. On September 30, 1990, Nozick was terminated.

Nozick then filed an age and gender discrimination complaint with the appropriate

---

**2.** Members of the Board were then aware that this prohibition would specifically impact Nozick and that it was contrary to their previous decision to allow her to become a resident with no strings attached.

EEOC Human Rights Office, and, in due course, the EEOC commenced this action against Watergate based solely on a claim of age discrimination.

At the ensuing jury trial, the EEOC was allowed to introduce, over Watergate's hearsay objection, evidence of statements made by Cearnal, while Chairman of the Recreation Committee, and by Jack Armistead, a member of that Committee, concerning Nozick's age.

Specifically, two Watergate employees, receptionists Boyd Clayton and Pamela Grimmett, were allowed to testify, Clayton by live testimony at trial, Grimmett by deposition, to statements by Cearnal and Armistead that the witnesses claimed to have overheard. Clayton testified that he heard Cearnal, on more than ten occasions between February and August, 1990, say to other Watergate residents, including William Volmer, then Chair of the Ad Hoc Tennis Committee, that "they wanted someone younger for a manager of the racket (sic) club," and that "Mrs. Nozick didn't fit their idea of someone that was young." J.A. 190. Grimmett testified by deposition that she overheard Armistead say to other Watergate residents, just a few months before Nozick was passed over, that "they were going to get somebody younger in there [the Racquet Club] to work." J.A. 274.

Following a two-day trial, the jury found that Watergate had discriminated against Nozick on the basis of her age, and that the resulting violation of the ADEA had been willful. On that basis, it awarded her back pay as monetary relief, and the district court awarded her an equal amount as liquidated damages because of the finding of willfulness.

This appeal followed. On it Watergate raises two issues:

"1. Whether the District Court committed reversible error by admitting the hearsay statements of age bias of individuals who were not decisionmakers in the employment action under review.

2. Whether there was sufficient evidence to support a finding that [Watergate] willfully violated the [ADEA]."

We discuss these in turn.

## II

As indicated, the stated basis of Watergate's objections in the district court to the admission of the Cearnal and Armistead statements and its challenge to their admission on this appeal, is only that they were "inadmissible hearsay."[3] The EEOC counters, principally, that the statements were, per Rule 801(d)(2)(D), admissions of a party opponent which, under Rule 801 are "not hearsay," hence were admissible as such; or, alternatively, that they were admissible in any event under Rule 803(3) as statements concerning the declarant's "state of mind," or, alternatively, as to Cearnal's statements, that they were admissible to impeach his in-court testimony that he had made no such statements.

Because we agree that the statements were admissible under Rule 801(d)(2)(D) as non-hearsay admissions of a party-opponent, we address only that as a proper basis for the district court's ruling.

Rule 801(d)(2)(D) provides in pertinent part that

—a statement is not hearsay if—[it] is offered against a party and is . . . a statement by the party's agent . . . concerning a matter within the scope of the agency . . ., made during the existence of the relationship.

---

3. The objection was first made in a motion in limine, filed by Watergate on the morning of trial, on the stated basis that the expected testimony would be "hearsay and inadmissible." J.A. 17. Following a hearing on that motion, the district court orally sustained the objection on the basis that if, as was assumed, the statements were not expressed to management, the evidence would be "irrelevant." J.A. 18. The district court, however, later reconsidered the matter upon the EEOC's renewed proffer of the evidence at trial following the close of Watergate's case. At that point, the court ruled orally that the evidence of Cearnal's statements might now be admissible to impeach his testimony on direct examination that he had never made any statements respecting Nozick's age in connection with the matters at issue, J.A. 188, and that in view of other trial evidence that had now disclosed the extent of both Cearnal's and Armistead's roles in the employment decision, the statements of both should now be admitted as substantive evidence on the dispositive motivational issue. J.A. 188–89.

The Cearnal and Armistead statements were therefore not excludable as hearsay—the sole basis of Watergate's objection—if at the time they were made these two men were "agents" of Watergate and if the statements concerned a matter within the scope of their agency.

The evidence clearly establishes that at the time these statements were made, both men were indeed "agents" of Watergate. Not, to be sure, general agents, but certainly agents for the limited purpose of assisting the Watergate legal entity, a condominium association, make decisions concerning its recreational program. This was a task that had as its central problem the organizational structure of the condominium's Racquet Club, a problem that came to include the subsidiary one of just who should occupy the position, however it might be styled in any reorganization, that Nozick then occupied.

As indicated in our recitation of the facts of record, Cearnal in particular and Armistead to a lesser extent were significantly involved in assisting Watergate's Board of Directors, the ultimate decisionmaker, in arriving at and implementing the solution to those problems. Cearnal was at all critical times a ubiquitous actor in the overall process that led eventually and inexorably to the decision to remove Nozick: Chairman of the Recreation Committee which first proposed the need for reorganization of the Racquet Club; then member of the Reorganization Committee appointed to consider the reorganization proposal that as Chairman of the Recreation Committee he had laid before the Board of Directors; and, in the most critical stage, the only resident member of the three-person Interview Committee that was then appointed to interview and make recommendations respecting candidates for the "new" position of "Manager" of the Racquet Club that had emerged from the reorganization.

Armistead, though much less a dominant presence in the overall process, was at the time of the statement attributed to him, a resident member of the Recreation Committee which originally came up with the proposal for reorganization of the Racquet Club in large part because of resident concern about Nozick's performance as, its Director.

Watergate contends that even so, neither of these men was, within contemplation of Rule 801(d)(2)(D), an "agent" of Watergate whose statements concerned "a matter within the scope of [their] agency." Specifically, the point is urged that they were neither officials nor employees of Watergate, but merely resident members of the association serving as volunteers on committees whose function in the matters at issue was purely advisory to the Board of Directors, which alone had the ultimate decision-making authority in those matters. In support of this contention, Watergate relies on two lines of cases, neither of which, upon inspection, provides the support claimed for it. One line involves decisions holding that particular statements suggesting age or gender bias (or other motive for challenged action)—whose admissibility in · evidence was not in issue—were not sufficient, because of their stray or vague character or the complete noninvolvement of their maker in the relevant decisional process, to prove the claimed discrimination or to withstand summary judgment.[4] These decisions obviously are inapposite to the instant case where the issue is precisely the admissibility of such statements and Watergate has not challenged the sufficiency of the statements to prove the discriminatory motive alleged.

■ The other line of cases does involve decisions directly concerning the admissibility of particular statements suggesting bias (or other motivational state of mind) of the maker and holding them inadmissible (or af-

---

4. *E.g., Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 10 (1st Cir.1990) (statements revealing "biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case"); *Guthrie v. Tifco Industries,* 941 F.2d 374, 379 (5th Cir.1991) (statements that are "vague and remote in time and administrative hierarchy ... are insufficient to establish discrimination"); *Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 925 (7th Cir.1988) (statements of "individuals who were not involved in the layoff process" insufficient); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990) ("stray" remarks, even of employer, insufficient to prove discrimination); *Mauter v. Hardy Corp.,* 825 F.2d 1554, 1558 (11th Cir.1987) (statements by one who "played no part in the decision ... too attenuated to present a genuine issue of material fact").

firming inadmissibility rulings) because of the maker's noninvolvement in the relevant decisionmaking process. Some rest decision on the basis that the statements were thereby revealed to be irrelevant to the issue of bias in that process, some on the basis that the maker's complete non-involvement in the matter at issue negated any finding of his agency in the matter so that the statements were inadmissible hearsay rather than party admissions under Rule 801(d)(2)(D).[5]

All of the cases in this latter line are distinguishable from the instant case in the critical feature—whether they rest inadmissibility on lack of relevance or lack of agency to qualify as party admission—that the statements' makers had literally no involvement in the decisional process. That, as the record here plainly demonstrates, cannot be said of either Cearnal or Armistead, whose involvement in the process here was palpable, though concededly not that of ultimate decisionmakers. Significant involvement, either as advisor or other participant in a process leading to a challenged decision, may suffice to establish "agency" for this purpose; it is not necessary that the declarant be the actual final decisionmaker. *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 488 (4th Cir. 1982) (employees involved in implementing challenged policy); *Nekolny v. Painter,* 653 F.2d 1164, 1171–72 (7th Cir.1981) (statements of "advisor" who had participated in interviews and made recommendation to final decisionmaker); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 874–76 (11th Cir.1985) (statements of official who made "employee evaluations and suggestions for rehiring" to another who made actual decision).

■ In the private governmental structure of condominium associations such as Watergate, *see* note 1 *supra,* the resident-members of various standing and ad hoc committees to which the governing Board of Directors has delegated specified duties and powers— whether of decision, or merely of study, advice, or recommendation—must be considered, for the purpose here at issue, "agents" of the association when acting within the scope of their respective committees' delegated duties and powers. Such committees, though staffed by "volunteers" from among its residents and not by elected officials or employees of the association, are critical, as certainly were Watergate's committees here, in the process by which this kind of private association of property owners conducts its affairs, including the making of personnel decisions.

As the district court rightly saw when all the evidence was in, the involvement of these two men as committee members in the decisional process leading to Nozick's termination was sufficient to establish them as agents of Watergate for the 801(d)(2)(D) purposes here at issue. The court therefore did not err in admitting, as admissions of a party-opponent, evidence of their overheard statements respecting Nozick's age as a consideration affecting her continued employment.

## III

We next consider Watergate's challenge to the district court's denial of its post-verdict motion for judgment as a matter of law with respect to the jury's finding that its violation of the ADEA was willful. Assessing the evidence under the appropriate standard, which requires that it be assessed in the light most favorable to Nozick, with the credibility of all that is favorable assumed, and the most favorable possible inferences drawn from it, *see, Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 243 & n. 14 (4th Cir.1982), the evidence clearly sufficed to support the finding.

■ The substantive test of "willfulness" in the ADEA context recently was clarified by the Supreme Court in *Hazen Paper Co. v.*

---

5. *E.g., Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.,* 951 F.2d 613, 619–20 (4th Cir.1991) (statements concerning bias of another were not within scope of declarant's agency, hence hearsay); *Hill v. Spiegel, Inc.,* 708 F.2d 233, 236–37 (6th Cir.1983) (inadmissible hearsay where "no evidence that [makers of statements] had *any* involvement in the decision") (emphasis supplied); *Fortino v. Quasar Co.,* 950 F.2d 389, 395 (7th Cir.1991) (statement of one who had no role in the discharge "had no probative value and, being prejudicial, was inadmissible"); *Garrett v. Lujan,* 799 F.Supp. 198, 201 (D.D.C.1992) (statement by unidentified person inadmissible as hearsay because unclear "whether the person . . . was involved in the selection process").

*Biggins,* 507 U.S. —, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). There, the Court distinguished between the employer who "incorrectly but in good faith and non-recklessly believes that the [ADEA] permits a particular age-based decision" and the employer who pretends that a decision was not age-based when in fact it was. 507 U.S. at —— ——, 113 S.Ct. at 1709–10. Although the employer in the first instance may be in violation of the ADEA, such a violation is not "willful," but in the second instance, where age is shown to have been "an undisclosed factor motivating the employer", *id.* at ——, 113 S.Ct. at 1709, a "willful" finding is supported. As the Court further explained, to prove an ADEA violation "willful", "the employee need not additionally demonstrate that the employer's conduct was outrageous, or provide direct evidence of the employer's motivation, or prove that age was the predominant rather than a determinative factor in the employment decision." *Id.* at ——, 113 S.Ct. at 1710.

■ Under this substantive test of willfulness, the evidence here clearly sufficed, assessed in the most favorable light to Nozick, to support the jury's finding of "willfulness". As in *Hazen,* the defendant here (Watergate) denied that age was a factor in its decision to fire the plaintiff-employee. The jury, presented with the properly admitted statements of Cearnal and Armistead suggesting otherwise and faced with Watergate's failure to offer any other credible explanation for Nozick's firing, had sufficient evidence before it to find the violation a "willful" one.

*AFFIRMED.*