United States Court of Appeals,

Eleventh Circuit.

No. 96-4129.

UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant, Cross-Appellee,

v.

MASSEY YARDLEY CHRYSLER PLYMOUTH, INC., Defendant-Appellee, Cross-Appellant.

July 24, 1997.

Appeals from the United States District Court for the Southern District of Florida. (No. 94-6488-Cv-KLR), Kenneth Ryskamp, Judge.

Before CARNES, Circuit Judge, and CLARK and CAMPBELL*, Senior Circuit Judges.

CAMPBELL, Senior Circuit Judge:

The Equal Employment Opportunity Commission (the "EEOC") brought this action in the district court against Massey Yardley Chrysler Plymouth, Inc. ("Massey Yardley"), alleging a willful violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* (the "ADEA"). The EEOC claimed that Massey Yardley unlawfully discriminated against Deloris P. Paigo ("Paigo") in her place of employment by subjecting her to a hostile work environment and harassing and constructively discharging her because of her age. After a trial lasting several days, a jury found that Massey Yardley had subjected Paigo to a hostile work environment because of her age and constructively discharged her, but that the ADEA violation was non-willful. Paigo was awarded back pay in the amount of $10,513.86 but, because the jury found the violation to be non-willful, did not receive liquidated damages. Both parties now appeal.

I.

Paigo was hired as a title clerk at Massey Yardley in 1987, at the age of 54. In the early 1990's, Paigo began going through menopause. Although her work performance remained good, she gained weight, had hot flashes, cried easily, and became nervous and sensitive about her age. She testified that most of her coworkers were supportive, but that James Cox ("Cox"), her immediate supervisor, and Bonnie Griffin ("Griffin"), the controller and general manager at the dealership, in

particular, began making demeaning, age-related comments on a daily basis about her physical and mental condition.[1]

Cox's comments frequently involved intrusive observations about Paigo's appearance.[2] While he had made comments before her menopause, Paigo explained, the tone changed thereafter, becoming angry and hurtful.

There was testimony that Paigo normally reacted to these remarks by turning red or otherwise indicating that she did not appreciate them. However, she once responded to one of Cox's comments about her bra by lifting her blouse, showing him that she was wearing a teddy, and demanding that he never ask about bras again.[3]

Griffin's comments included demeaning statements about Paigo's mental capacity.[4] Paigo testified that she told Griffin she would understand how it felt when she went through menopause, whereupon Griffin responded that "she would never go through it and become an old lady like [Paigo] was."

According to Paigo, the comments of Cox and Griffin hurt and embarrassed her. As a result, she became depressed, felt nauseous, broke out in hives, cried often, and came to dread going to work. Two former coworkers, Jodie Krause and Carmela Rosenthal, confirmed that they had seen

---

[1]At trial, Cox denied that he was Paigo's immediate supervisor, asserting that he was just the office manager or head clerk, and that Griffin was Paigo's supervisor. However, company documents, Paigo's testimony and Cox's own affidavit, all of which were introduced at trial, are to the contrary.

[2]Paigo and a couple of her former coworkers testified that Cox routinely remarked that Paigo's hair was turning gray; that she was getting a "fat ass"; becoming "an old fat bag"; that her "boobs" or "tits" were sagging or not bouncing or that she had "saggy, baggy boobs" and should go home and put on a bra; that she was too old for the style of clothes she wore; and that she should wear "old lady" dresses, "knee high nylons" and a bra. He also asked whether "we [were] having any hot flashes today", and, if she forgot something, he would comment that she was becoming forgetful.

[3]According to Massey Yardley, Cox was not the only employee to whom Paigo displayed her underwear. Jean Ann Andriole, a saleswoman at the dealership, testified that Paigo was flirting with an employee when she bent over, lifted her dress, and "mooned" him.

[4]Paigo testified that Griffin would preface assignments with remarks such as "if you think your mind is capable of doing it if by the time you get upstairs in your office you won't forget what I asked you to do." If Paigo did forget something, Griffin would remark that she was getting "senile" or "losing it" or would ask whether Alzheimer's disease was setting in early.

her cry or blush, and Krause added that Paigo had complained to her in tears that she could not get Cox and Griffin to stop making the remarks. Other coworkers testified, however, that they had never seen nor experienced age discrimination at the dealership.

On several occasions, Paigo testified, she told Cox and Griffin that she was going to complain directly to Herbert Yardley ("Yardley"), the president of the dealership. They warned her, in an "authoritative" tone of voice, against taking such action. Despite their warnings, Paigo testified, she twice attempted to talk to Yardley. But, as soon as she indicated that the problem was with Griffin, Yardley dismissed her, telling her to work it out with Griffin directly because he would not interfere between her and her supervisor.[5]

The situation came to a head when Paigo returned from a week-long vacation on Monday, September 28, 1992, to find her office in a mess, with new files and mail strewn around, instead of stacked neatly on her desk. A short while later, Paigo drafted a letter, in which she demanded a large raise and an end to the age-related comments, and left copies in the offices of Cox, Griffin, and Yardley.

The next day, Tuesday, September 29, 1992, the switchboard operator showed Paigo a newspaper ad for a "title clerk" at Massey Yardley, and asked her whether she was "going to quit." Shortly thereafter, Paigo confronted Griffin in her office, where they were soon joined by Cox, and asked what they were doing about her letter, and demanded an explanation for the job ad.

According to Paigo, Griffin responded that a new title clerk would start the following Monday as Paigo's "helper", and that the company had just forgotten to tell her. Griffin then went on to deny Paigo's request for a raise in salary. As for the age-related comments, Griffin asserted that she had no authority to stop them, and that Paigo was "too sensitive" and would "just have to get used to it" since she was, after all, "an old lady."[6] At that point, Paigo told them to have the new

---

[5]At trial, Yardley could not recall whether Paigo had tried to talk to him, but indicated that, if she did and had said she had a problem with her job, he would have told her to work it out with Griffin, and then, if still unresolved, either she or Griffin could have come to him.

[6]Cox and Griffin testified that Paigo never complained to them about the age-related remarks before the demand letter. Still, Griffin testified, she told Paigo she would immediately call the managers at the dealership and tell them that there would be no more kidding or joking between

person start right away because she was quitting.

Paigo's replacement, Dinorah David, started work almost immediately. She testified, and company records confirm, that she applied for and was hired as a "title clerk", not as a "helper" or "assistant", the day Paigo quit.

After her departure from Massey Yardley, Paigo searched for work without success for over two years. Finally, in June of 1994, she was hired as a service cashier at another car dealership, a position that pays less than what she was earning when she left Massey Yardley.

Paigo filed an age discrimination claim with the EEOC soon after leaving Massey Yardley. The investigator assigned to the case in March of 1993, Erica Lacour, found cause the following November. In January of 1994, Massey Yardley responded to a proffered conciliation agreement with an "unconditional offer of reinstatement", offering Paigo her old job, with no back pay or a raise, and a "policy statement reaffirming its policy not to discriminate." Paigo rejected the offer because she believed the harassment would continue, and she did not want to work under Cox and Griffin. Just before trial, in August of 1995, Massey Yardley offered to institute an anti-discrimination policy and to place Paigo at a dealership operated by Yardley's son, where she would seldom encounter Cox or Griffin. Paigo refused this offer largely, she testified, because she knew she would still run into Griffin, who went there periodically to do the books, and because she was happy at her new job, despite the lower pay.

## II.

After the close of evidence, the EEOC moved for judgment as a matter of law on the issue of willfulness. Fed.R.Civ.P. 50(a). The EEOC argued that if liability were to be found under the ADEA, the violation was necessarily a willful one. Massey Yardley also moved for judgment as a matter of law, asserting that the EEOC had, in certain particulars, failed to make out a case of hostile environment age discrimination. The district court denied both motions.

The case was submitted to the jury by means of four questions set out in a so-called "Special Verdict Form." Responding to these, the jury found (1) that Paigo was subjected to a hostile work

Massey Yardley employees and Paigo.

environment because of her age; (2) that a reasonable person would have found the hostile working conditions she was subjected to so difficult or unpleasant as to have felt forced to resign; (3) that Paigo lost $10,513.86 in back pay and fringe benefits because of her constructive discharge; but (4) that defendant's conduct with regard to Paigo was not done with knowledge or reckless disregard as to whether it was a violation of the ADEA.

After the verdict, the EEOC moved under Fed.R.Civ.P. 50(b) to renew its motion for judgment as a matter of law on willfulness. The EEOC further moved to conform the damages to the evidence (i.e. by increasing the $10,513.86 award), and for equitable relief that, among other things, would enjoin defendant from further employment discrimination. Massey Yardley renewed its motion for judgment as a matter of law. All motions were denied by the district court without comment.

The EEOC now appeals, and Massey Yardley cross-appeals, from the court's denial of the parties' post-judgment motions. We affirm in part, vacate in part, and remand.

III.

A. *Massey Yardley's Motion for Judgment as a Matter of Law*

Massey Yardley argues on appeal that the EEOC's evidence was inadequate, as a matter of law, to establish hostile environment age discrimination because the offending employees' conduct was not unwelcome to Paigo or, at least, was not indicated by her to be unwelcome. *See Meritor Savs. Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986) (a Title VII claim alleging sexual harassment). *See also Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982) (same).[7]

We find no merit in this argument. Paigo testified copiously that the challenged remarks hurt and upset her. She also testified to telling Cox and Griffin that she was going to complain to Yardley and to seeing him and attempting to convey her complaint. Others testified to her turning

---

[7]Neither party questions, hence we do not actually decide, whether the hostile environment doctrine developed in Title VII actions applies in an ADEA action, a question so far decided specifically by only one circuit court of appeals, the Sixth. The latter stated, "we find it a relatively uncontroversial proposition that such a (hostile environment) theory is viable under the ADEA." *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 834 (6th Cir.1996).

red or looking annoyed, thus indicating her resentment.  Some remarks, moreover, were so patently offensive that a jury could have inferred from their very nature both that Paigo was offended by them and that those making them would have realized they were unwelcome.

The district court gave the jury an unobjected-to instruction on the need to find the remarks unwelcome.  The matter was clearly for the jury, turning "largely on credibility determinations committed to the trier of fact."  *Meritor Savs. Bank,* 477 U.S. at 68, 106 S.Ct. at 2406.  We hold that the district court properly rejected defendant's Rule 50 motion for judgment as a matter of law.

B. *The EEOC's Motion for Judgment as a Matter of Law that the ADEA Violation was "Willful"*

The EEOC moved at the close of evidence for judgment as a matter of law that any ADEA violation found would necessarily be a willful one.  After the district court denied the EEOC's motion, it submitted the issue of willfulness to the jury in question 4 of the Special Verdict Form.[8] The jury found no willfulness.  The EEOC then unsuccessfully renewed its motion for a determination of willfulness as a matter of law.  On appeal, the EEOC makes essentially two arguments:  (1) that "harassment that is severe or pervasive enough to be actionable is always willful", causing the harassment found here to be willful;  and (2) that even if we reject the above proposition, the jury had to find a willful violation here under certain instructions that were given.

The EEOC's first contention gives insufficient weight to the Supreme Court's differentiation between a simple violation of the ADEA and a "willful" violation.  The term "willful" appears in 29 U.S.C. § 626(b) as a further requirement for the imposition of liquidated damages over and above compensatory damages.  Congress viewed liquidated damages as "punitive in nature."  *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 125, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985). Accordingly, the *Thurston* Court refused to accept the then EEOC's argument, "that a violation of the Act is "willful' if the employer simply knew of the potential applicability of the ADEA." *Id.* at

---

[8]Question 4 actually asked, "Do you find the Defendant's conduct with regard to Deloris Paigo was done with knowledge or reckless disregard as to whether it was a violation of the Age Discrimination in Employment Act," to which the jury checked the answer, "No." This formulation follows the Supreme Court's determination that a violation of the ADEA is "willful" if the employer either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 614, 113 S.Ct. 1701, 1708, 123 L.Ed.2d 338 (1993).  The district court gave a similar definition in its jury charge.

127, 105 S.Ct. at 625. In requiring actual knowledge of the ADEA or its reckless disregard, the Court said that a lesser standard "would result in an award of double damages in almost every case.... Both the legislative history and the structure of the statute show that Congress intended a two-tiered liability scheme." *Id.* at 128, 105 S.Ct. at 625. *Accord Hazen Paper Co.,* 507 U.S. at 605, 113 S.Ct. at 1703. The initial tier is "designed solely to ensure the proper compensation for individuals whose rights under the ADEA are violated and [the] second [is] ... to punish employers whose conduct constitutes a willful violation of the ADEA's proscriptions." *Formby v. Farmers and Merchants Bank,* 904 F.2d 627, 631 (11th Cir.1990) (citation omitted).

Acceptance of the EEOC's present argument would lead back to the blurred standard rejected in *Thurston,* under which most ADEA violations would, by definition, be willful. Moreover, the argument pays insufficient heed to the jury's cardinal role in determining the fact-bound question of willfulness.

In asking us to reject the jury's refusal to find willfulness, the EEOC relies upon cases from this and other circuits where courts of appeals have upheld jury findings of willfulness. *See, e.g., Ramsey v. Chrysler First, Inc.,* 861 F.2d 1541 (11th Cir.1988); *Spanier v. Morrison's Management Servs. Inc.,* 822 F.2d 975 (11th Cir.1987); *E.E.O.C. v. Watergate At Landmark Condominium,* 24 F.3d 635 (4th Cir.1994); *Kelewae v. Jim Meagher Chevrolet, Inc.,* 952 F.2d 1052 (8th Cir.1992). In none of these did the court of appeals substitute a willfulness finding of its own in place of a jury's failure to find willfulness.

On the conflicting testimony in the present record, a jury finding of willfulness might well have been sustainable, but that is different from saying it was required. Willfulness is a question of fact for the jury, raising, as it does, issues of the employer's knowledge and understanding of the relationship between certain conduct and the legal requirements of the ADEA. 29 U.S.C. § 626(c)(2) (1985). *Cf. E.E.O.C. v. Westinghouse Elec. Corp.,* 725 F.2d 211, 218 (3d Cir.1983) *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984). The burden of proving willfulness was on the plaintiff. Were we to accept the EEOC's argument, we would have to take the extreme step of directing a verdict in favor of the party having the burden of proof. This can be done only when the

evidence favoring the claimant is so one-sided as to be of overwhelming effect. *See, e.g., Grey v. First Nat'l Bank in Dallas,* 393 F.2d 371 (5th Cir.), *cert. denied,* 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968). *See also* 9A C. Wright & A. Miller, Federal Practice and Procedure, § 2535 at 325-29 (1995).

Here, the evidence was conflicting as to the actual conduct. Different inferences were possible as how the perpetrators understood what they were doing. The jury was not required to believe all or nothing of each side's case: it could accept parts of a witness's testimony and reject other parts of it. Hence it might have found plaintiff's case just credible enough to show a violation, but insufficient to establish that the offenders knew that their conduct violated the ADEA or showed reckless disregard for whether their conduct was so prohibited. While Paigo's harassers acknowledged knowing it was wrong to treat people differently on the basis of age, they evidenced no specific knowledge concerning the ADEA, and conceivably were ignorant that their crude remarks—which they professed to regard as a form of lighthearted banter—either violated or ran a serious risk of violating the statute. Apparently Paigo did not voice her objections widely—or so the jury might have believed. There is no way we can say, without resolving credibility issues entrusted to the jury, that the proof was so one-sided and of such overwhelming effect as to compel a finding of willfulness as a matter of law.

The EEOC makes the further argument that the jury was required to find willfulness under particular instructions the court gave. These instructions told the jury (incorrectly as the EEOC concedes) that the test for constructive discharge was whether the employer *deliberately* made the employee's working conditions intolerable. Since the jury found that Paigo was constructively discharged, the EEOC argues that it must necessarily have found that Massey Yardley's conduct was deliberate, hence willful, creating an internal conflict within the verdict.

Even if this is so, however, an inconsistency in the verdict would not be a proper basis for us to find willfulness as a matter of law. Assuming arguendo that either the finding of constructive discharge or the finding of willfulness must fall in light of the other, it is impossible to tell which was "wrong." Moreover, the alleged inconsistency had yet to exist when the EEOC filed its motion

for judgment as a matter of law at the close of the evidence. *See* Fed.R.Civ.P. 50(a) and (b). Any inconsistency between the jury's answers created by the court's subsequent instruction formed, at most, the basis for a post-verdict motion for a new trial or for further deliberation by the jury. *See* Fed.R.Civ.P. 49(b). No timely motion of such a nature was made, resulting in a waiver of the issue. *See Stancill v. McKenzie Tank Lines, Inc.,* 497 F.2d 529, 534-35 (5th Cir.1974); *Austin-Westshore Constr. Co., Inc. v. Federated Dep't Stores, Inc.,* 934 F.2d 1217, 1226 (11th Cir.1991). *See also* 9A C. Wright & A. Miller, Federal Practice and Procedure, § 2513 at 233 (1995). *See also Cundiff v. Washburn,* 393 F.2d 505, 507 (7th Cir.1968) (purpose of waiver rule is to promote judicial efficiency).

We conclude that the district court did not err in denying the EEOC's motion for judgment as a matter of law on the "willfulness" issue.

C. *Increasing the Jury's Back Pay Award to Paigo*

The EEOC contends that the district court erred in refusing to increase the amount of the jury's compensatory award to Paigo. In response to the question, "What amount of back pay and fringe benefits did Deloris Paigo lose because of her constructive discharge?", the jury responded $10,513.86. This amounts falls considerably short of the total pay Paigo would have received had she continued to work between the time she left Massey Yardley's employ on September 29, 1992, and the time in January 1994, when the record would support a finding that Massey Yardley first offered to reinstate her. The EEOC argues that the jury lacked any rational basis for cutting off back pay prior to the January 1994 date, and that, therefore, the court should have allowed its motion to alter or amend judgment by "conform[ing] the damages to the evidence"—i.e. by increasing the $10,513.86 to the sum needed to compensate her for back pay through the January 1994 date. *See* Fed.R.Civ.P. 59(e).

This is not a situation where a party impermissibly seeks a new trial for damages for the first time on appeal. *See Baker v. Dillon,* 389 F.2d 57, 58 (5th Cir.1968); *Electro Servs. Inc. v. Exide Corp.,* 847 F.2d 1524, 1530 (11th Cir.1988). In its unsuccessful post-trial motion to conform the damages to the evidence, and now on appeal, the EEOC is seeking immediate corrective relief from

the district court rather than a new trial, taking the position that there was no genuine factual issue left to be decided concerning back pay. We agree, *see infra.*

The purpose of relief under the federal employment anti-discrimination laws is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418-19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (a Title VII case); *see also* Joseph E. Kalet, Age Discrimination in Employment Law 106 (2d ed.1990). Consistent with this concept, once liability for harassment and constructive discharge on the basis of age is established, the injured victim is presumptively entitled to back pay from the date of the discriminatory discharge until the date of judgment, unless the victim obtains or could have obtained substantially equivalent work before that time. 29 U.S.C. § 626(b) (West 1985); *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 794 (3d Cir.1985) (back pay is "a mandatory element of damages" under the ADEA). While the injured victim has a duty to mitigate damages by being reasonably diligent in seeking substantially equivalent employment, the burden of proving lack of diligence is on the employer. Kalet, Age Discrimination in Employment Law at 120-122; *Cf. Smith v. American Serv. Co. of Atlanta, Inc.,* 796 F.2d 1430, 1431 (11th Cir.1986) (a Title VII case); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1527 (11th Cir.1991) (a Title VII case) (specifically, the employer must show that the claimant failed to make reasonable efforts to obtain other work, or that comparable work was available and the claimant did not seek it out).

Here, the uncontradicted evidence presented by the EEOC indicated that, following her discriminatory discharge, Paigo diligently sought other employment with little success until she finally obtained a job as a service cashier with another dealership in June of 1994. Massey Yardley first offered to reinstate her in January 1994, an offer she declined. Prior to then there is no evidence indicating any material opportunity for her to mitigate damages. Massey Yardley has not questioned the EEOC's calculations as to the amount of back pay (the wages and fringe benefits that Paigo should have earned) that would be due during this period of time.

The jury's award of $10,513.86 represented only six months worth of back pay. Yet nothing in the record indicates the occurrence of some event that would justify cutting off back pay after six

months or at any time before January of 1994. Conceivably the jury meant to cut off back pay as of March 1993, when EEOC Investigator Erica Lacour first began investigating Paigo's charges. The employer suggested at trial that the EEOC should have asked for Paigo's reinstatement then. But even if we were to be persuaded that the EEOC should have requested Paigo's reinstatement prior to its investigation, the question of the EEOC's diligence is immaterial to Paigo's back pay entitlement. *See Miller v. Int'l Paper Co.,* 408 F.2d 283, 291 (5th Cir.1969) (a Title VII case) ("The action or inaction of the EEOC [regarding conciliation] cannot affect the grievant's substantive rights under the statute.").

Massey Yardley argues on appeal that the jury properly cut off Paigo's back pay in March of 1993, because she "removed herself from the job market to travel." This argument is without merit. The record indicates that she did not move to Tennessee until September of 1993, six months later than the jury's termination of benefits. Moreover, Paigo testified, without contradiction, that she continued to seek work after moving to Tennessee, having moved there only after vigorously looking for work in Florida for nearly a year. *Cf. E.E.O.C. v. Guardian Pools, Inc.,* 828 F.2d 1507, 1511 & n. 1 (11th Cir.1987) (a Title VII case) (refusing to reduce the back pay period by the number of weeks plaintiff spent in New Jersey). In any case, the jury could not rationally have based a decision to cut off back pay as of March 1993 upon a move that did not occur until six months later.

We hold that the amount of back pay to which Paigo is entitled extends from the date she was constructively discharged in September of 1993 until the date she rejected Massey Yardley's first unconditional offer of reinstatement in January of 1994, an amount that the EEOC presently claims to be $33,642.53.[9] The district court had the authority to increase the amount of the jury's award to cover the above period without running afoul of the rule of *Dimick v. Schiedt,* 293 U.S. 474, 486-87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935) (holding that the Seventh Amendment to the United States Constitution prevents a court from increasing a jury's award or conditioning the denial

---

[9]In its motion for injunctive relief and to conform the damages to the evidence, the EEOC sought $29,553.29 in back pay. In its appellate brief, the EEOC explains away this discrepancy by saying that the amount in the motion was based on an erroneous calculation of interest. We leave all such details to the district court upon remand.

of a new trial on the defendant's acquiescence to an additur). Courts recognize an exception to *Dimick* where the jury has found the underlying liability and there is no genuine issue as to the correct amount of damages. *See, e.g., Moreau v. Oppenheim,* 663 F.2d 1300, 1311 (5th Cir.1981) ("The constitutional rule against additur ... is not violated in a case where the jury has properly determined liability and there is no valid dispute as to the amount of damages." (quoting *Decato v. Travelers Ins. Co.,* 379 F.2d 796, 798 (1st Cir.1967))). Here, the jury found liability under the ADEA, and there can be no reasonable dispute as to the amount of lost wages and benefits to which Paigo was entitled through January of 1994. As Paigo is willing to accept this uncontrovertible minimum, no purpose would be served by a new trial. *Compare Dimick,* 293 U.S. at 486-87, 55 S.Ct. at 301 (where the proper amount of damages is in dispute and where the amount actually awarded is inadequate, the appropriate remedy is a new trial on damages) *with Taylor v. Green,* 868 F.2d 162, 165 (5th Cir.1989) ("[W]hen the amount of damages is not disputed and a party is entitled to damages under the verdict as a matter of law ... "[i]t would be a mere formality to order a partial new trial limited to the issue of damages when the court could immediately thereafter grant summary judgment for the undisputed amount.' " (quoting 6A J. Moore's Federal Practice ¶ 59.08[8] (2d ed.1987))). Accordingly, we vacate the award of $10,513.86 and remand to the district court with directions to calculate a corrected award that includes the full amount of compensation Paigo would have received during the period from her constructive discharge from Massey Yardley until she declined reinstatement in January 1994, and to enter a judgment in conformity, with appropriate interest.

D. *The EEOC's Request for Injunctive Relief*

The EEOC contends that the district court abused its discretion in denying its post-verdict motion for injunctive relief. The EEOC asked for an order enjoining Massey Yardley from further age discrimination and requiring company management to undergo EEOC training, the posting of a notice concerning the present matter, and neutral and fair employment references for Paigo. The district court refused this relief without opinion. We review a district court's decision to deny equitable, including injunctive, relief under an abuse of discretion standard. *See* 29 U.S.C. § 626(b)

(West 1985) (providing for equitable relief at the discretion of the district court); *Cf. N.A.A.C.P. v. City of Evergreen, Ala.,* 693 F.2d 1367, 1370 (11th Cir.1982) (a Title VII case) ("The grant or denial of an injunction is committed to the sound discretion of the district court." (citation omitted)). The district court abuses its discretion, *inter alia,* when it denies injunctive relief in the face of evidence of consistent past discrimination, *id.,* or when it fails to articulate its reasons for denying the requested relief, *Wilson v. S & L Acquisition Co., L.P.,* 940 F.2d 1429, 1438 (11th Cir.1991) (citation omitted).

Paigo's decision not to seek reinstatement in this case does not prevent the EEOC from pursuing the broader equitable remedies listed above, it being the EEOC, and not the individual claimant, that is suing. *U.S. E.E.O.C. v. Tire Kingdom, Inc.,* 80 F.3d 449, 451-52 (11th Cir.1996) (right to investigate); *E.E.O.C. v. Harris Chernin, Inc.,* 10 F.3d 1286, 1291 (7th Cir.1993) (right to sue). As the EEOC stressed at oral argument, there would be little point in its having the independent power to sue if it could not obtain relief beyond that fashioned for the individual claimant.[10] In *Harris Chernin, id.* at 1292 (citing to *E.E.O.C. v. Goodyear Aerospace Corp.,* 813 F.2d 1539, 1544 (9th Cir.1987)), the Seventh Circuit suggested that the EEOC is normally entitled to injunctive relief where it proves discrimination against one employee and the employer fails to prove that the violation is not likely to recur. The EEOC represents the public interest when litigating claims, and, through injunctive relief, seeks to protect not only the rights of the individual claimant, but those of similarly-situated employees by deterring the employer from future discrimination. *See id.* at 1291 "In this respect, the EEOC acts "to vindicate the public interest in preventing employment discrimination.'" (quoting *General Tel. Co. v. E.E.O.C.,* 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980)).

The discriminatory conduct here was primarily that of Cox and Griffin, both of whom remain in the same supervisory positions at the dealership without, so far as can be ascertained, having been disciplined for their behavior. Indeed no one at the company seems to have admitted

---

[10]It should be added that while Paigo did not seek reinstatement, she may desire and believe she needs an injunction ordering the company to provide neutral and fair job references for her as well as desisting from mention of this action.

to any wrongdoing.[11] And, while a draft anti-harassment policy was proffered along with the second unconditional offer of reinstatement, there was no evidence at trial that the draft was adopted or disseminated. All of this suggests that Massey Yardley failed "to prove that the violation is unlikely to recur," the second prong of the test set forth in *Harris Chernin,* and that injunctive relief may be needed "to eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 880 (11th Cir.1986) (citation omitted).

On appeal, Massey Yardley argues that the district court properly denied equitable relief, because Paigo did not timely complain to the company about her harassment, that the company thereafter adequately responded to her untimely complaints, and that the discriminatory conduct was isolated and would not recur.[12] However, the first two arguments are in large part contradicted by the jury's finding of harassment and constructive discharge. The third argument, involving a judgment call as to which we would have been aided by a statement of reasons from the district court, seems contrary to evidence mentioned above as well as to evidence indicating that Massey Yardley and its employees were, to say the least, extraordinarily naive as to their responsibilities under the ADEA.

We conclude that the district court abused its discretion in turning down all equitable relief out of hand while failing to provide any reasons for so doing. Accordingly, we remand the case to the district court so that it can grant the requested relief, or insofar as it finds persuasive reasons to deny particular items of relief, to state its reasons for so doing.

## IV.

We AFFIRM in part, VACATE in part, and REMAND the case to the district court for further proceedings consistent with this opinion.

---

[11]Yardley, the president, testified that he did not believe there was any indication of age discrimination against Paigo, characterizing her claims as "silly" and "ridiculous."

[12]While Massey Yardley has raised these arguments defending the denial of the requested relief, it has also made clear, in both its response to the plaintiff's motion for injunctive relief and at oral argument, that it is willing to comply with whatever the court orders on this front.