Larry SWANSON and Gerald Sidenstick,
Plaintiffs–Appellants, Cross–
Appellees,

and

Patrick Sullivan and Walter Raffe,
Plaintiffs–Cross–Appellees,

v.

LEGGETT & PLATT, INCORPORATED,
Defendant–Appellee, Cross–
Appellant.

Nos. 97–2061, 97–2185.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1997.

Decided Sept. 3, 1998.

Bruce J. VanHeukelem (argued), David A. Shaneyfelt, Hoogendoorn, Talbot, Davids & Godfrey, Chicago, IL, for Plaintiffs–Appellants in No. 97–2061.

Bruce J. VanHeukelem (argued), James A. Davids, Hoogendoorn, Talbot, Davids & Godfrey, Chicago, IL, for Plaintiffs–Appellees in No. 97–2185.

Dennis P.W. Johnson (argued), Pugh, Jones & Johnson, Chicago, IL, for Defendant–Appellee, Cross–Appellant.

Before CUDAHY, EASTERBROOK and EVANS, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiffs Gerald Sidenstick and Larry Swanson were born days apart in the winter of 1942–43, Sidenstick on January 29, Swanson on February 4. Forty-nine years later, they lost their jobs within weeks of each other. On February 25, 1992, Sidenstick was fired from his position as plant engineer at Fashion Bed Group (FBG), a division of the defendant, Leggett & Platt, Inc. (Leggett). On March 13, Swanson lost his job as FBG's materials manager. A coincidence? In the plaintiffs' view, not entirely. Swanson and Sidenstick, along with two former coworkers, filed a lawsuit in federal court claiming that each was fired because of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§621–634. Swanson and Sidenstick appeal the district court's order granting summary judgment to their former employer in their age discrimination lawsuit. The district court also *denied* Leggett's motion for summary judgment with respect to the other two plaintiffs whose names appear in the caption of this appeal due to a misguided cross-appeal by Leggett; their claims are not before us.

Leggett told the plaintiffs they were fired because of FBG's poor financial condition. According to Leggett, the plaintiffs' positions were eliminated as part of a substantial reduction in force at FBG; the plaintiffs were culled because their salaries were high and their responsibilities could be assumed by other employees. Leggett maintains that the 39–year–old president of FBG, John Elting (born May 12, 1952), decided who would be let go. The plaintiffs contend that they "proffered at least nine pieces of a puzzle which, when taken together, would allow a reasonable jury to believe that [Leggett] fired them on the basis of age," rather than to save money. Br. of Pls.–Appellants 31.

Some of the pieces of the plaintiffs' puzzle involve alleged admissions by agents of Leggett that employees were terminated on the basis of age. The participants sometimes recall the relevant conversations differently. At this stage, we credit the versions submitted by the plaintiffs. *See Hudson v. McHugh*, 148 F.3d 859, 861 (7th Cir.1998).

Nicholas Chiaramonte, FBG's vice president of engineering (born November 29, 1932), was among the casualties of the reduction in force. After Elting fired the then 59–year–old Chiaramonte on March 13, 1992, Chiaramonte had a conversation with Richard Singer, the CEO of FBG. Chiaramonte went into Singer's office and asked him what happened. Singer said, "I don't know." Chiaramonte prodded, "What do you mean you don't know?" Singer eventually replied that "[a]ge was part of it."

Although Singer was a senior manager of FBG, there is no evidence that he played a role in the decision to terminate Chiaramonte. Only evidence on the attitudes of the employees involved in the decision to fire the plaintiffs is relevant. *See Fairchild v. Forma Scientific*, 147 F.3d 567, 574 (7th Cir.1998). Singer indicated that the decision was made by Elting, and that Singer only learned that Chiaramonte had been fired after the fact. The plaintiffs have presented no evidence to counter Singer's representation that he was not involved, only speculation:

> The evidence is at least clear that Elting dethroned Singer, with Singer's apparent cooperation. In the realm of high-stakes corporate politics involving a struggle between a President and CEO of a $60 million division, it takes no creative imagination to infer that Elting told Singer (or someone told Singer) about Elting's plan to get rid of older managers whom he regarded as an obstacle, and that Singer, in a moment of weakness on the day of his dethronement, blurted this to Chiaramonte, and then later, because of corporate loyalty, clammed up about it. Given this *plausible scenario*, Singer would have been "involved in the decision-making process" and his statement to Chiaramonte should carry some weight in view of the totality of the facts.

Br. of Pls.-Appellants 38 (emphasis added). A plausible scenario cannot counter direct evidence offered in support of a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *Jenkins v. Heintz*, 124 F.3d 824, 831–32 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1304, 140 L.Ed.2d 469 (1998); *Senner v.*

*Northcentral Technical College*, 113 F.3d 750, 757–58 (7th Cir.1997); *Karazanos v. Navistar Transp. Corp.*, 948 F.2d 332, 336–37 (7th Cir.1991).

Elting did inform Singer of his intention to fire Chiaramonte before the fact. So Singer was in a position to know something about Elting's intentions. We have held that it is not an abuse of discretion to treat a warning by a terminated employee's supervisor about the "attitudes, intentions and/or policy" of the decision maker who fired him as an admission of a party opponent. *See Hybert v. Hearst Corp.*, 900 F.2d 1050, 1053 (7th Cir.1990); *cf. EEOC v. Watergate*, 24 F.3d 635, 640 (4th Cir.1994). In such cases, the supervisor is presumed to speak for the decision maker regarding the employment decision. *See* Fed.R.Evid. 801(d)(2)(D). The plaintiffs have not established that Singer's discussion with Chiaramonte about Chiaramonte's firing was "within the scope of" Singer's responsibilities, *id.* In fact, at the time of the conversation between Chiaramonte and Singer, Singer had already been replaced as CEO of FBG. *See* Br. of Pls.-Appellants 14. Unless an employee is authorized to speak for the decision maker about the employment decision at issue, the statements of a non-decision maker are imputed to the decision maker only if the former influenced the latter's decision. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400–01 (7th Cir.1997). The plaintiffs have not submitted evidence that Singer influenced Elting—or any other possible decision maker—regarding the terminations of Chiaramonte, Swanson or Sidenstick. Singer's statement to Chiaramonte therefore carries no weight.

A database supervisor, Debbie Lunn, told Chiaramonte that "[w]e are going to get rid of all you old people." According to the plaintiffs, "a strong nexus exists between Lunn's background and the thinking of higher-ups. Lunn frequented a bar along with other senior managers who were the younger replacement employees of plaintiffs and others. She reported to the younger manager who replaced Chiaramonte, later marrying him." Br. of Pls.-Appellants 39. And a consultant, Doug Moskowitz, told one

of FBG's maintenance mechanics, "We have to get rid of some of the old guys," or words to that effect. Moskowitz was a member of a team of consultants hired by FBG in 1991 to conduct a study of FBG's operations and recommend improvements. The plaintiffs allege that the consultants became de facto high-level managers who were in a position to influence or at least know "the thinking of higher ups."

The fact that an employee socialized with a decision maker is not evidence that the employee has knowledge of the decision maker's motives for a particular business decision. *See Chiaramonte v. Fashion Bed Group*, 129 F.3d 391, 397 & n. 2 (7th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998). And even assuming that some of the consultants were in a position to know about the motivations of or influence Elting and other senior FBG managers, the plaintiffs have failed to place Moskowitz within a circle of influential or knowledgeable consultants. As evidence that Moskowitz was an influential guy, plaintiffs first point to his use of the plural "we" in his statement. Although plaintiffs do not elaborate, presumably the argument is that Moskowitz would have used "they" or "you" if he had no clout. In the event that our cases have not already made this point clear, *see, e.g., Chesapeake & Ohio Ry. Co. v. International Harvester Co.*, 272 F.2d 139, 142 (7th Cir.1959), such idle speculation does not *remotely* resemble the sort of specific fact required to oppose a motion for summary judgment. The most that can be reasonably inferred from the use of "we" in this context is that the speaker was referring to a group that included himself and perhaps the employee to whom he was speaking. *See, e.g., Merriam Webster's Collegiate Dictionary* 1338 (10th ed.1994); *Webster's New World Dictionary of the American Language* 1609 (2d College ed.1979); *Webster's Third New International Dictionary of the English Language Unabridged* 2588 (1976). The usage alone does not even suggest what group was intended, let alone the speaker's influence within the group, if any. The plaintiffs' other evidence of Moskowitz's "leadership role at the company and his close relationship to Elting" is the following statement

Moskowitz made to another employee: " '[I]f you don't want me in this building, you just let me know and I will go tell John Elting that you don't want me in here.' " *Reply Br. of Pls.–Appellants/Cross–Appellees* 7. This statement, which is simply an offer to act as a messenger, reveals nothing about Moskowitz's knowledge of or influence in particular termination decisions. Absent evidence of Moskowitz's influence or knowledge, his statements have no relevance, whatever influence or knowledge other consultants might have possessed.

The plaintiffs maintain that seven of fifteen senior managers over 40 lost their jobs in 1992, while only one senior manager under 40 was fired. The defendant denies that FBG recognized any such category of senior manager. The plaintiffs defend their taxonomy by reference to evidence introduced in a motion to reconsider the judgment, but without attempting to justify their reliance on new evidence. *See Commodity Trend Serv., Inc. v. CFTC*, 149 F.3d 679, 683–84 (7th Cir. 1998). In any event, the data would not be probative because they do not include the qualifications of both the individuals retained and the individuals terminated. *See Vanasco v. National–Louis Univ.*, 137 F.3d 962, 967 (7th Cir.1998); *see also Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140–41 (7th Cir.1998).

The plaintiffs challenge the defendant's rationale for the firings on the grounds that Elting offered inconsistent accounts of when he made the termination decisions. In his deposition, when Elting was first asked when he "had done an evaluation of how Fashion Bed Group could reduce costs," Elting answered, "I don't know specifically when." He was then asked, "Would it have been in 1992, January?" Elting replied, "Yeah. It was probably towards the middle, end of January." Later, Elting was asked when he had come to his conclusion that, as he said, FBG "was out of time. We had no luxuries to afford any extra costs." Elting answered,

Obviously it would have been when it became clear that our numbers weren't coming in, we weren't getting the dollars out

and I got my hands on the January [financial] numbers, which would have been early February. So chronologically, just thinking through time frames here, because everything gets kind of muddled together for me because it was a difficult time, I think the ultimate decision to step up to the plate and do what had to be done was not a January decision. It was a February decision after the realization struck through to me. I would like to correct the record on that.

According to the plaintiffs, the difference between late January and early February is significant because the financial statements on which Elting claimed to rely apparently were not available until February. So if Elting made the decisions in January, he could not have relied on the financial statements. According to the plaintiffs, the material factual dispute is whether "Elting got caught in a lie" during his deposition. Br. of Pls.-Appellants 41. The record does not support the plaintiffs' accusation. Elting was candidly and explicitly uncertain of the precise timing of his decision, and the plaintiffs understandably do not argue that the uncertainty, about events more than three years before the deposition, is not credible. Elting clearly indicated that his first attempt to fix the time was only an estimate. He revised his estimate about 50 questions later and—as far as the record shows—without being confronted with any contradictory information about when the financial statements might have been ready. The challenged testimony does not establish a material issue of fact. *See Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir.1998); *Board of Trustees v. Insurance Corp.*, 969 F.2d 329, 332–33 (7th Cir.1992).

 The plaintiffs offer other reasons for rejecting Leggett's rationale for the firings. For example, the plaintiffs argue that Elting's motivation for firing the plaintiffs was his desire to "take control of the company." We will assume for the sake of argument the plaintiffs' proposition that Elting wanted to push aside Dick Singer, FBG's CEO. In itself, that is irrelevant to the inquiry, because it is not inconsistent with terminating the plaintiffs for financial reasons. The plaintiffs contend that in a meeting among FBG executives the day before the firings of Swanson and a number of other FBG employees, there was no discussion of the financial motivations for the firings, and that exit interviewers were instructed to tell terminated employees that their services were no longer needed "due to a change in the direction of the company." According to the plaintiffs, this exposes the defendant's duplicitous rationale for the pretext it is.

First of all, the plaintiffs' citations to the record do not support their claim that FBG's finances were not discussed; there is simply a statement from an attendee who does not recall one way or the other. More important, the plaintiffs offer no reason why financial concerns would have to have been discussed at this particular meeting if that were really a motive for the reduction in force. And the fact that there were plans to tell terminated employees that they were departing due to a change in the direction of the company certainly is not evidence that "Elting was in fact motivated to surround himself with a new set of younger, peer-age managers who would do his bidding, and to eliminate every senior manager whom he thought stood in his way, especially older, more experienced managers, like the plaintiffs." Br. of Pls.-Appellants 43–44. The phrase "a change in direction of the company" is not inconsistent with financial retrenchment; indeed, the locution appears to have been chosen precisely because it is compatible with almost any substantive rationale. Further, the plaintiffs stipulated that when they were fired they were told that the reason was FBG's financial circumstances. If what happened at the meeting is inconsistent with that stipulation, than this is just an inconsistency in the plaintiffs' own case, which is not a basis for opposing summary judgment. *Cf. Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir.1994). If there is no inconsistency, the plaintiffs' evidence about the meeting is insignificant.

 According to the plaintiffs, "Elting told a young replacement manager after the firings that all of the managers fired in early 1992 were fired because they were resistant to change in the company." Br. of Pls.-Appellants 23. This is another instance in

which the plaintiffs have misstated the record. Here is the relevant portion of the manager's testimony cited by the plaintiffs as support for their "fact":

Q. Did you ever have any suspicions yourself that certain people were being singled out on account of their age?

A. No. This suit was a total surprise.

Q. Have you read the complaint in this case?

A. No. I also don't understand it, because there were other people that were let go that were younger too, Candy Singer, for example, who was the CEO's daughter. I believe it was all on job performance.

\* \* \* \* \* \*

Q. What did you hear about Candy Singer?

A. *She* didn't want to—it was her way, basically, *didn't want to make the changes needed to grow with the company*, for the success of the company.

Q. Who did you hear that from?

[A. Larry Dalicandro.]

\* \* \* \* \* \*

Q. Anybody else?

A. I believe *John Elting*.

\* \* \* \* \* \*

Q. Did you ever hear that people were being let go because they were resistant to change in the company?

A. Yes.

Q. Who did you hear that from?

A. Again, *I don't know*, but—

Q. Just common knowledge?

A. Yes.

R. 125–2, Ex. H, at 110–13 (emphasis added). The only attribution to Elting of the phrase "resistant to change" is with respect to a 30–year–old (Candy Singer). This illustrates that the phrase is not a code word for age animus. In any event, there is no evidence that a decision maker ever used the phrase with respect to one of the plaintiffs. The second, unattributed report of the phrase's use ("just common knowledge") carries no weight. *See Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849–50 (7th Cir. 1992) (per curiam).

■■■ The plaintiffs assert that a termination of 190 employees that occurred in December 1991 was merely seasonal. The defendants essentially concede this point, but of course it is not evidence that FBG was not losing money or that the plaintiffs' firings were age related. The plaintiffs also contend that FBG's substantial expenditures on management consultants at the time of the reduction in force demonstrates that FBG was not worried about saving money. Spending money on consultants, however, is no more evidence of a company's indifference to financial difficulties than its continuing to spend money on advertising or computer software. Consultants supply information, a resource that is hopefully valuable and almost certainly costly. The defendant is not claiming it was *liquidating* FBG, so its objective would not have been to reduce all FBG's expenditures to the lowest possible level—that would likely mean no revenue and perhaps unavoidable fixed costs. Selectively cutting certain types of expenditures while maintaining or even increasing other spending is an unexceptional response to financial distress in a line of business that remains potentially profitable. The plaintiffs do not assert that the consultants simply performed the jobs of terminated employees at greater expense, so the consulting expenditures are not evidence of pretext. *See Chiaramonte*, 129 F.3d at 400–01. On the same grounds, no inference of pretext arises from other attempts by FBG to improve its performance.

The plaintiffs think it is significant that "at no time did [Leggett] ever tell Elting in early 1992 that he should undertake any reduction in force." Pls. Statement of Facts, R. 125–1, ¶ 128, at 99. The significance of this qualified claim is doubtful, since the extent of Elting's autonomy is not described. In any event, in support of the claim the plaintiffs cite deposition pages omitted from the record, so we cannot consider it. And the plaintiffs' assertion that "[a]t no time did [Leggett] officials ever consider FBG to be in dire financial condition," *id.* ¶ 135, at 100, is simply another distortion of the record. A statement by Elting that in November 1991 he felt that "the crisis wasn't as great" cannot be interpreted as a denial that there was a

crisis, and is not illuminating about the state of FBG in February and March of 1992.

Equally trivial is the question whether a particular consultant's memorandum of March 12, 1992, discussing "Critical Success Factors" contains any references to personnel reductions. The plaintiffs contend that this memorandum was "an exhaustive list of concrete plans to be undertaken" by FBG in order to become profitable. Br. of Pls.–Appellants 25. The plaintiffs imply that the memorandum's failure to discuss the need for personnel reductions demonstrates that any firings therefore must have only advanced Elting's private agenda. But the document does not purport to be an *exhaustive* list of plans. Nor have the plaintiffs cited any other evidence supporting that characterization of the document. In fact, the memorandum solicits "other measures [that] might be appropriate additions to the list," indicating that it was not intended to be exhaustive. And there is nothing in the statement of facts that the plaintiffs submitted to the district court that indicates that the memorandum was a comprehensive list. Pls. Statement of Facts, R. 125–1, ¶¶ 157–160, at 104. If the list is not exhaustive, omissions are not probative, which may explain—but does not justify—the spontaneous exaggeration of the evidence in the plaintiffs' appellate brief.

The plaintiffs' assertion that FBG's 1991 losses "had no *material* impact on [*Leggett's*] financial position," Br. of Pls.-Appellants 25 (emphasis added), sheds no light on Elting's motivations. In this context, materiality simply refers to whether the details of an event must be broken out on a company's balance sheet. *See, e.g., Koch v. Koch Indus.*, 969 F.Supp. 1460, 1558–59 (D.Kan.1997); *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1237 (S.D.N.Y.1992). Whether or not the losses of a small division of a large enterprise warrant a separate item on the balance sheet is no indication that the larger entity's managers are likely to view the division's losses with indifference. In a nationwide chain of stores, for example, the performance of a single store in a small town may never have a material impact on the chain's balance sheet, but that would certainly be no reason for the store's managers to assume that a poor performance would go unnoticed at headquarters.

The plaintiffs argue that there is a material factual dispute whether their job performances played a role in their terminations. Leggett contributes to the confusion on this issue by claiming that it "presented three reasons for terminating plaintiffs here," Br. of Def.-Appellee 29— "the potential cost savings to FBG [from] eliminat[ing] the position; the value to FBG of this job; and lastly, the employee's performance," *id.* at 9—while conceding that the plaintiffs' performances were acceptable. Leggett asserts that the plaintiffs "must demonstrate a material factual dispute about *each of the reasons* in order to defeat a motion for summary judgment." *Id.* at 29. But Elting's description of his method indicates that he essentially employed a single criterion in deciding whom to fire—his estimate of the effect of the firing on FBG's bottom line. According to Elting's account, he relied on a few key variables, but the variables were not independent grounds for termination. The process that Elting described would eliminate the employees with the largest salaries after deducting (some estimate of) the marginal value of their services to FBG. The marginal value of an employee's services to FBG would depend in part upon the employee's performance, but would also depend on how easily the employee's duties could be assumed by others as well as on the market for FBG's products.

So Leggett provided just one reason for selecting the participants in its 1992 reduction in force. The plaintiffs were only required to show that Elting did not follow the procedure he described. But the plaintiffs' claims that they were more experienced than their replacements and were performing well do not contradict Leggett's position that they were let go because Leggett concluded it was not getting its money's worth from competent but relatively expensive and expendable employees. The plaintiffs did not present evidence that FBG did not save money by firing them. Nor is there evidence to sup-

port an assertion that their duties could not be assumed by others. The plaintiffs dispute who took over Swanson's job, and suggest that Swanson's duties were assumed by someone less experienced, but there is nothing to demonstrate an inability to fill Swanson's shoes. The plaintiffs claim to have evidence that Sidenstick's duties were taken over by one or more unqualified individuals, but again their characterizations of the record are just not accurate and do not support their claims. *Cf. Lawson v. Trowbridge,* 153 F.3d 368, 371 (7th Cir. 1998). For example, two individuals who the plaintiffs say conceded an inability to do Sidenstick's job merely allow that Sidenstick was more qualified. *See* R. 125–3, Ex. V, at 62; *id.,* Ex. U, at 40. Leggett's rationale is not undermined by evidence that better qualified but more expensive employees were terminated. The plaintiffs assert that in response to their age discrimination complaints to the Illinois Department of Human Rights, Leggett took the position that they were fired because of poor performance. In both cases, however, Leggett stated, "All persons affected would still be employed if economic problems had not necessitated these actions." An employee's performance is a variable in the formula Elting claims to have applied, so references to an employee's performance in an earlier proceeding are not inconsistent with Leggett's position in this litigation. *See Chiaramonte,* 129 F.3d at 401–02.

■ The plaintiffs also contest Leggett's position that Elting was the sole decision maker, but nothing really turns on this point because the plaintiffs have no evidence that any of the other possible decision makers had discriminatory motives. The plaintiffs do not deny that Elting played a significant role in the decisions, and there is no evidence that Elting was not the primary decision maker, so no inference of pretext would be created by a showing that the terminations were a collective decision. In *Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1422–23 (7th Cir. 1992), the question whether there was a single decision maker was treated as material because there was evidence that two other possible participants in the termination decision were aware that the plaintiff's early retirement benefits were about to vest on the basis of job tenure. *See id.* at 1419. This was before *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), established that such an impending vesting—based on years of service, not age—was not material to an age discrimination claim. *See id.* at 612, 113 S.Ct. 1701. Contrary to the plaintiffs' view, not every factual dispute in litigation is evidence that someone must be lying. An otherwise immaterial factual dispute does not give rise to a jury question just because a jury might disbelieve the defendant's position on that point and so conclude that the defendant must be lying across the board. *See Jang v. Biltmore Tire Co.,* 797 F.2d 486, 489–90 (7th Cir.1986). That is why we also attribute no significance to another factual dispute asserted by the plaintiffs—whether they were replaced by younger workers. The plaintiffs cannot show pretext even if they were replaced by younger workers, or if similarly situated younger workers received better treatment. *See Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 394 (7th Cir. 1998); *Fairchild,* 147 F.3d at 572.

The plaintiffs have fashioned their tapestry of evidence out of filaments of fact so tenuous that the finished fabric possesses no perceptible pattern and is incapable of supporting their claims. *See Testerman v. EDS Tech. Prods. Corp.,* 98 F.3d 297, 306 (7th Cir.1996). The defendant's motion for summary judgment was therefore properly granted.

■ The defendant also filed a cross-appeal just because it wished to defend the judgment below on the basis of an argument not addressed by the district court. This is a frivolous reason to cross-appeal. *See Sims v. Mulcahy,* 902 F.2d 524, 545 (7th Cir.1990). A prevailing party may defend the judgment below on any basis supported by the record, whether or not the district court relied on it. *See Plumb v. Fluid Pump Serv., Inc.,* 124 F.3d 849, 857 (7th Cir.1997); *In re Volpert,* 110 F.3d 494, 500 (7th Cir.1997). The defendant thought that by cross-appealing it might get a chance to file two briefs, one advancing the argument the district court ignored, and another responding to any rebuttal of this point by the plaintiffs. *See* Resp. to Appellants' Mot. to Dismiss Cross–Appeal 2. It

did not work out that way, because we consolidated the cases to minimize the disruption caused by the cross-appeal. *See Jordan .v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir.1987); *cf.* Proposed Fed. R.App. P. 28(h) (effective Dec. 1, 1998).

The judgment is AFFIRMED. The cross-appeal is DISMISSED. The parties will bear their own costs.