Robert Lee **HOLLEMAN**, Petitioner–Appellant,

v.

Jack **DUCKWORTH**, Respondent–Appellee.

No. 95–3152.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1998.

Decided Sept. 15, 1998.

Jerold S. Solovy, John J. Hamill (argued), Jenner & Block, Chicago, IL, for Robert Lee Holleman.

Bridget L. Field, Office of Attorney General, Criminal Appeals Division, Chicago, IL, Michael A. Hurst (argued), Office of Attorney General, Indianapolis, IN, for Jack R. Duckworth.

Before CUDAHY, EASTERBROOK and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

The petitioner appeals from a judgment dismissing without prejudice his application for a writ of habeas corpus. The district court concluded that the petitioner had abused the writ. Back in 1981 the petitioner had filed an application that attacked the same judgment and that was adjudicated on the merits. On that occasion, the district court had denied the petition, a judgment that was upheld on appeal. *See Holleman v. Duckworth*, 700 F.2d 391 (7th Cir.1983). The petitioner filed this petition on February 21, 1995, so the 1996 habeas corpus reforms do not apply. *See Pisciotti v. Washington*, 143 F.3d 296, 299–300 (7th Cir.1998). Applying the old version of the habeas law, we conclude that the present record is inadequate to demonstrate abuse of the writ. Accordingly, we remand the case for an evidentiary hearing to establish what the petitioner knew about the claim, when he knew it, and the earliest he reasonably could have known it.

## Background

In October 1976—at least in early October—Scott Moore, Robin Opfer, and Robert Lee Holleman shared an apartment at 5142 South Blackstone Avenue in Chicago. At three in the morning on October 6, 1976, Hammond, Indiana police discovered Robin Opfer's body just off the Indiana Toll Road with eight bullet wounds. According to the autopsy, Opfer was killed by a gunshot wound to the chest and lungs that caused extensive bleeding. On October 11, 1976, Chicago police officers found Moore's body in the apartment. *See United States ex rel. Holleman v. Duckworth*, 770 F.2d 690 (7th Cir.1985); *People v. Holleman*, 82 Ill.App.3d 409, 37 Ill.Dec. 782, 402 N.E.2d 784 (1980). At a South Bend, Indiana motel on October 17, police from Michigan and Indiana arrested Holleman for armed robbery, pursuant to a Michigan warrant. Holleman was brought to the St. Joseph County, Indiana jail on the Michigan charge, as well as on a federal charge for the October 15, 1976 robbery of a South Bend federal credit union. *See Holleman v. United States*, 721 F.2d 1136 (7th Cir.1983); *United States v. Holleman*, 575 F.2d 139 (7th Cir.1978).

On several occasions during his time in custody, Holleman expressed a desire to make a voluntary statement to the police. In his statements, Holleman explained that on October 3, 1976, he learned that Scott Moore would be acquiring an ounce of cocaine. He saw an opportunity to, in the argot of that period, "rip off" Moore. Holleman enlisted the help of Frank Love. Holleman and Love and an acquaintance of Love, Mike Cheatem, agreed that Love and Cheatem would come to Moore's apartment on the morning of October 4, on the pretense of buying some heroin. Holleman later told Moore to expect some customers. Around nine in the morning on October 4, Love, Cheatem and another man, Robert Williams, arrived on schedule at Moore's apartment. When Love entered Moore's bedroom, brandished a revolver and explained to Moore that the transaction was to be more one-sided than Moore had been led to believe, Moore reached for the gun he kept under his pillow. Love then shot Moore in the back several times, took some heroin and all Moore's money, covered up the body, and went into the living room, shutting the door to Moore's bedroom on the way out. Then Love and the other survivors waited for the return of Robin Opfer, who had gone out to the store earlier that morning. *See* 1977 Exs. 20 & 21.

According to Holleman's statements, when Opfer returned to the apartment, Love grabbed her, and with Williams' help, took her into another bedroom, laid her on a mattress, tied her up and gagged her. Sometime later, Love shot Opfer once in the back. Opfer was still alive the next day, and Love fired another shot at her, but that attack did not kill her either. The next evening the men—Holleman, Love, Williams and Cheatem—placed her inside Moore's car and drove to Hammond, Indiana, via the Chicago Skyway. They got off the Skyway near the Indiana state line, where the Skyway connects with the Indiana Toll Road. Near the intersection of 108th Street and Indianapolis Boulevard, Love told Opfer to get out of the car. Love followed her out of the car, continued to walk behind her, and then shot her from behind about six times. After thus disposing of Opfer, the quartet returned to Moore's apartment. Back at the apartment, Holleman took Moore's billfold

and identification, then claimed Moore's car, which he drove to South Bend. In South Bend, he used Moore's name to check into the motel where the police found him about 10 days later. *See id.*

On October 21, the Hammond police arrested Holleman for the murder of Robin Opfer. On November 19, a Lake County, Indiana grand jury indicted Holleman, Love, Cheatem and Williams for murder in the first degree and murder in the perpetration of a robbery. In May 1977, Holleman's case was tried before a jury in Lake County Superior Court. Holleman was acquitted of first degree murder and convicted of felony murder. He was sentenced to spend the rest of his life in the Indiana State Prison. He was 23 years old. Holleman appealed to the Indiana Supreme Court on the grounds that his statements to the police were improperly admitted. The Indiana Supreme Court turned down his appeal on February 5, 1980. *See Holleman v. Indiana,* 272 Ind. 534, 400 N.E.2d 123 (1980). Holleman did not seek review by the United States Supreme Court. *See Jones v. Page,* 76 F.3d 831, 851 (7th Cir.1996).

On October 15, 1981, Holleman, apparently proceeding pro se, filed his first application for a writ of habeas corpus. His petition, like his direct appeal to the Indiana Supreme Court, only raised the propriety of admitting some of his confessions. *See* 700 F.2d at 393. In April 1982, the District Court for the Northern District of Indiana dismissed the petition on the merits, and this court affirmed that judgment in 1983. *See id.* at 397.

Also on October 15, 1981, Holleman filed a pro se petition for post-conviction relief in Lake County Superior Court. The original petition asserted ineffective assistance of counsel on two grounds—failure to introduce expert testimony about how long withdrawal from heroin takes and failure to timely file notice of an insanity defense. The matter progressed at a leisurely pace on the Superior Court docket. In 1984, an Indiana deputy public defender entered an appearance on behalf of Holleman. According to Holleman, sometime after 1987 one of Holleman's attorneys in the public defender's office interviewed Holleman's trial attorney, James

Frank, who by that time was no longer a practicing lawyer. *See Frank v. United States,* 914 F.2d 828, 829 (7th Cir.1990); *In re Frank,* 504 N.E.2d 285 (Ind.1987); *cf. In re Frank,* 440 N.E.2d 676 (Ind.1982). No hearing had yet been scheduled when Holleman filed an amended petition on October 24, 1990, adding the claim that Frank "was ineffective because he operated under an actual conflict of interest which adversely affected his performance, especially his ability to evaluate the petitioner's defenses and crossexamine several witnesses." Holleman filed two more amended petitions during 1991.

On February 12, 1992, the Lake County Superior Court held a hearing on the third amended petition. Holleman's principal witness in the February 12, 1992 hearing was his old trial lawyer, former deputy public defender James Frank. Frank explained that he had represented Love prior to Holleman's 1977 trial. When Frank represented Love, Love told Frank that on the day Opfer was killed, Love had been in South Bend, where he cashed a U.S. savings bond and received treatment at a venereal disease clinic. Tr. 190. According to Frank, Indiana dismissed the murder charges against Love after Frank discovered that the savings bond indicated the date and time it was cashed, that the bank clerk who handled the transaction remembered Love and identified him as the person who cashed the bond, and that the clinic's records and one of its nurses, Mary Schaar, supported Love's story. On the grounds of insufficient evidence, Indiana dismissed the charges against Love without prejudice in February 1977 (and against Cheatem and Williams in November 1977).

Frank stated that the judge conducting Holleman's trial had appointed Frank to represent Holleman when Holleman's original attorney, also with the public defender's office, withdrew:

> Judge Clement asked me if I saw any conflict in—as a result of my having represented Frank Love, if I saw any conflict in my representation of Mr. Holleman, and I said off the top of my head, no, I didn't, so he was aware that I was completely versed on the facts of the case. I believe Mr. Holleman had a speedy trial motion filed, and I think because of my familiarity the appointment was something of a natural, I guess.

Tr. 192–93. Frank told the judge that he did not see any problems. As far as Frank could recall, neither Holleman nor the prosecutors were privy to this discussion. *See id.* (There appears to be no official record of this colloquy on the appointment of Frank to represent Holleman.)

Frank went on to describe his "shock" when Indiana called Mary Schaar to testify at Holleman's trial. He had apparently not foreseen that she would be called by the government in its case-in-chief. Frank then addressed why he did not cross-examine Schaar:

> Q. [Petitioner's counsel]: [D]id you consider cross-examining Mary Schaar?
>
> A. [Frank]: Of course not.
>
> Q. Why not?
>
> A. She's my witness. How could I attack her credibility and maintain the—how will I put this? That there was absolutely no way that I could attack her credibility without negatively affecting the rights and interests of Mr. Love. How could I do that?
>
> Q. So effectively you're saying that you did not cross-examine in order to preserve Mr. Love's dismissal, is that correct?
>
> \*    \*    \*
>
> A. Absolutely, there was no way I could in any way participate in weakening the basis for the dismissal of the charges against Mr. Love. That was just not possible.
>
> Q. As you stated earlier, the statements of Mr. Holleman implicated Mr. Love as the shooter?
>
> A. Yes.
>
> Q. Did you consider a defense of attempting to shift culpability for the crime to Frank Love?
>
> A. Not at the time I didn't.
>
> Q. Why not?
>
> A. I don't know, maybe I was—maybe I was proud of having gotten the charge against him dismissed that I guess it would never have occurred to me. I was the wrong person to think about reimplicating

him. I don't know. I wasn't the person who would have thought about implicating Frank Love in a crime I had just been instrumental in having dismissed against him.

Tr. 199–200.

Mary Schaar also testified at the February 12, 1992 hearing. At Holleman's 1977 trial, she had been called by the state to provide evidence that "Frank Love was not involved" in the crime. 1977 Tr. 172. In 1977, Schaar testified that she treated Love for gonorrhea sometime on October 5, 1976, in South Bend; when she was shown a picture of Love, she confirmed that it was "the same Frank Love [she] treated on October 5th." 1977 Tr. 178. Frank did not cross-examine. 1977 Tr. 179. At the 1992 hearing, Schaar revealed that, when she testified at Holleman's 1977 trial, she actually had no independent recollection of treating Love on October 5, 1976. She said she based her 1977 testimony on clinic records recording a visit under the name of Frank Love. She reported that her identification of the photograph of Love was based on the fact that "he had been there several times before and so I knew him as Frank Love by the clinic records, and the man on the picture was Frank Love, as I knew him." Tr. 225. Schaar also noted that the clinic did not request any identification when a patient came in for treatment. Tr. 226.

The Superior Court, in the person of the same judge who presided at Holleman's 1977 trial, denied Holleman's petition for post conviction relief on May 21, 1993. The Indiana Court of Appeals affirmed in October 1994. See Holleman v. Indiana, 641 N.E.2d 638 (Ind.Ct.App.1994).

## Discussion

■ Holleman raised a number of claims in his 1995 habeas petition, but he only pursues one on appeal, ineffective assistance of counsel based on an allegation that Frank's earlier representation of Love created a conflict of interest. Indiana argues that Holleman has abused the writ of habeas corpus by inexcusably neglecting to raise the conflict of interest claim in his first application. See McCleskey v. Zant, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). The district court dismissed all Holleman's claims in his 1995 petition on that basis. The court

did not conduct an evidentiary hearing, so Indiana's abuse-of the-writ defense turns on whether, as a matter of law, Holleman cannot show cause and prejudice. See id. at 494, 111 S.Ct. 1454.

Holleman maintains that he was unaware of his trial counsel's conflict of interest when he filed his 1981 habeas petition. Indiana contends that Holleman has essentially admitted that he did know. Indiana seizes on statements Holleman made in his 1995 Traverse supporting this petition:

Holleman wrote to his appellate counsel in September of 1977, asking him to investigate this conflict of interest in Attorney Frank's representation of both Frank Love ... and Holleman.... [and] to use this issue in the direct appeal, if it was in fact a viable issue. But [a]ppellate counsel chose not to investigate this issue in any manner, and did not use this obvious winning issue in the direct appeal.

Traverse, R. 20, at 22. The record in this case also includes a September 12, 1977 letter to Holleman from his appellate counsel in his direct appeal, which states in part, "According to my interpretation of your letter of August 21, 1977, you believe your attorney, James Frank, was competent except for having represented Frank Love earlier. Therefore, I will not file any additional papers alleging any incompetency of counsel." Id. Ex. 3. In another document, Holleman argues that "[a]t trial, the extent of the conflict became apparent." Mem. in Supp. of Pet., R.1, at 9. This statement does not say explicitly to whom the conflict became apparent, but in context it appears to refer to the trial judge, not Holleman.

Holleman's 1995 statements demonstrate that as early as 1977 Holleman became aware of his trial attorney's prior representation of Frank Love, but they do not establish that Holleman was aware of a conflict of interest at that time or, more to the point, that Holleman was aware of facts that indicated a conflict of interest. The record also does not show what Holleman knew about the trial judge's knowledge of a potential conflict of interest. See United States v. Fish, 34 F.3d 488, 492 (7th Cir.1994). (At least according to Frank's 1992 testimony,

the trial judge was aware of a potential conflict, not just successive representations.) So this record does not tell us whether what Holleman knew in 1981 would have supported a habeas claim based on conflict of interest. The record also does not establish as a matter of law whether what Holleman did not know but could have "discover[ed] upon reasonable investigation" would have supported a claim for relief. *McCleskey*, 499 U.S. at 498, 111 S.Ct. 1454.

We need not review every possible permutation of what Holleman might have known and when he might have known it. The *record does not rule out the possibility that all Holleman knew by 1981 was that James Frank represented Frank Love*. Then if Holleman were not aware that the trial judge knew about the possibility of a conflict of interest, he was not in a position to make a conflict of interest claim. *See Cuyler v. Sullivan*, 446 U.S. 335, 350–51, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Wilson v. Morris*, 724 F.2d 591, 593 (7th Cir.1984) (en banc).

Indiana suggests that "to the extent that [Holleman] required the aid of the court to assemble the evidentiary support for his claim, either through discovery or expansion of the record or evidentiary hearings, he could have enlisted it." Supplemental Br. of Appellee 15. This assertion is unadorned with any analysis of the relevant rules that would have determined Holleman's ability to invoke the aid of the court. *See* 28 U.S.C. § 2254, Rules Governing Section 2254 Cases in the United States District Courts, Rules 6–8. There is no reason to simply assume that Holleman would have been entitled to discovery. *See, e.g., Kirkpatrick v. Whitley*, 992 F.2d 491, 496 (5th Cir.1993); Erwin Chemerinsky, *Federal Jurisdiction* 793 (2d ed. 1994) ("Generally, discovery is uncommon in habeas cases."). Holleman's entitlement to an evidentiary hearing would have depended on whether he was able to identify disputed facts. Indiana does not tell us what the nature of such a dispute might have been. And although the conflict claim was *not before the district court at the time*, in considering Holleman's 1981 habeas petition, the district court did refuse a request by Holleman to "expand the state record." 1982 Mem. & Order 8.

This record also does not show that in 1981 Holleman had any other resources at his disposal for an investigation of his conflict claim. In fact, Holleman claims that he "eventually paid an inmate to file his first habeas petition," suggesting that he did not have the assistance of a lawyer in preparing his first habeas petition. (At the same time, Holleman filed his state petition pro se.) This matter therefore requires an evidentiary hearing to determine whether Holleman "could have discovered through reasonable diligence and investigation" a conflict of interest claim. *Barnard v. Collins*, 13 F.3d 871, 878 (5th Cir.1994).

■ Holleman must also demonstrate prejudice in order to clear the abuse-of-the-writ hurdle. James Frank's testimony suggests that the trial judge knew or reasonably should have known "of the possibility of a conflict of interest," and raises serious doubts about whether the judge "inquire[d] adequately into the potential conflict." *Fish*, 34 F.3d at 492; *see id.* at 493 ("In order to explore adequately the risk of a conflicting interest, a court must examine the facts and details of an attorney's interests to determine whether those interests diverge with those of the client. . . ."). If those doubts are not dispelled on remand, then prejudice may be presumed. *See id.* Otherwise, the district court must determine whether Frank " 'actively represented conflicting interests' " such that "the 'conflict of interest adversely affected [Frank's] performance.' " *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)); *see also Sullivan*, 446 U.S. at 341–42, 100 S.Ct. 1708; *Spreitzer v. Peters*, 114 F.3d 1435, 1450–51 (7th Cir.1997).

We note that in his 1993 ruling on Holleman's Indiana post-conviction petition, the same trial judge who conducted Holleman's 1977 trial absolved himself of error. The judge concluded that there was *simply no conflict of interest because Holleman was ultimately only convicted of felony murder*, and Love's involvement in the killings was not relevant to that charge. Supplemental Br. of Pet.-Appellant, App. 7, at 11. But the Indiana Court of Appeals recognized a conflict of interest, although that court con-

cluded that it was harmless for the same reason the Superior Court concluded there was not even a conflict. *See* 641 N.E.2d at 640–41. We further note that the fact that Holleman was only convicted of felony murder does not rule out the possibility that a conflict of interest had an adverse effect on Frank's representation of Holleman. *See Rosenwald v. United States*, 898 F.2d 585, 588 (7th Cir.1990) (per curiam). Holleman need not show that without the conflict he was likely to have been acquitted of the felony murder charge. *See Strickland v. Washington*, 466 U.S. 668, 692–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir.1994).

We have not overlooked Indiana's passing reference to the possibility that state procedural default justifies dismissing Holleman's petition. It is just that a passing reference to an issue is inadequate: Indiana has waived the point. *See CFTC v. Tokheim*, 153 F.3d 474, 476 n. 3 (7th Cir.1998). (The district court apparently relied on state procedural default in disposing of the conflict claim; the court's discussion of the issue, however, is no more illuminating than the one in Indiana's brief.) In any event, during Indiana's 1992 evidentiary hearing, Holleman was assured that his failure to raise the conflict of interest issue on direct appeal would not be held against him, since James Frank did some work on Holleman's direct appeal. *See* Tr. 255. That assurance appears to be based on the right analysis of state waiver. *See Pisciotti*, 143 F.3d at 300–01; *cf. Stoia*, 22 F.3d at 768–69 & n. 2. State waiver need not be pursued on remand. *See Cole Energy Dev. Co. v. Ingersoll–Rand Co.*, 8 F.3d 607, 609 (7th Cir.1993).

### Conclusion

Because the present record does not permit us to conclude that, as a matter of law, Holleman has abused the writ, we remand the case to the district court with instructions to conduct an evidentiary hearing on the question. If the district court finds that Holleman has not abused the writ, it will necessarily have addressed many of the points relevant to the merits of Holleman's conflict of interest claim. But if the district court does determine that the conflict of interest claim was not defaulted, it should proceed to address the merits of the claim in the first instance. The judgment is VACATED and REMANDED for further proceedings consistent with this opinion. Circuit Rule 36 shall apply. *Cf. Nichols v. United States*, 75 F.3d 1137, 1146 (7th Cir.1995).