Jack INDURANTE, Plaintiff–Appellant,

v.

LOCAL 705, INTERNATIONAL BROTH-ERHOOD OF TEAMSTERS, AFL–CIO, Defendant–Appellee.

No. 97–2733.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1998.

Decided Nov. 4, 1998.

Katherine M. Anthony (argued), Chicago, IL, for Plaintiff–Appellant.

Melissa J. Auerbach Cornfield & Feldman, Chicago, IL, Peggy A. Hillman (argued), Indianapolis, IN, for Defendant–Appellee.

Before CUDAHY, EASTERBROOK and ROVNER, Circuit Judges.

Cudahy, Circuit Judge.

In May 1992, Daniel Ligurotis, the head of Teamsters Local 705, hired the plaintiff, Jack Indurante, to work as one of the Local's business agents. Not long afterward, a court-appointed overseer kicked Ligurotis out of the Teamsters for corruption. *See United States v. International Bhd. of Teamsters*, 814 F.Supp. 1165, 1168 (S.D.N.Y.1993). In a related development, in June 1993 the president of the Teamsters, Ron Carey, placed the Local under the control of a trustee. *See International Bhd. of Teamsters v. Local Union 705*, 827 F.Supp. 513 (N.D.Ill. 1993). Carey appointed Harold Burke as the trustee, Gerald Zero as assistant trustee and John McCormick as international representative of the Teamsters. Burke resigned as the trustee in August 1994 and Zero took over; McCormick became assistant trustee. Zero contested and won an election to run the Local when the trusteeship concluded. He took over as the elected head of the Local in April 1995.

At 2 p.m. on October 7, 1994, Indurante received a pink slip with his regular paycheck. The bad news came in the form of the following letter from Zero, at that time running the Local as trustee:

> As part of my mandate as Trustee of Local 705, I am authorized and required to review all operations of the Local. Included in our review is the entire personnel system, the current personnel of the Local, and the need to change the direction of the policy of the Local. We intend to make the operation and personnel more streamlined, efficient, and able to implement new policies.
>
> Based upon that review, we have determined that your employment at Local 705 should not be continued. Therefore, effective October 7, 1994 you will no longer be employed at Local 705. Prior to receiving your last paycheck, we request that you return all files relative to your servicing assignment and all property belonging to Local 705. At that time, you will receive accrued vacation and severance.
>
> Thank you for your service to Local 705.

That day five other business agents received the same letter.

On May 10, 1996, Indurante sued the Local, alleging that he was fired on account of his age, *see* 29 U.S.C. §§ 621–634, and Italian heritage, *see* 42 U.S.C. §§ 2000e–2000e–17. The district court granted the Local's motion for summary judgment on both counts. Indurante did not find the court's reasoning persuasive with respect to his national origin claim, and appeals the judgment on that basis.

According to the Local, Indurante was fired as part of a program to implement "[t]he mandate of the government ordered trusteeship of Teamsters Local 705 ... to clean house, to rid Teamsters Local 705 of the corruption which had permeated the Union during the Ligurotis reign." Answering Br. of Def.-Appellee 17. As the reference to cleaning house suggests, in the trustees' view the elimination of corruption called for something more than a surgical intervention: "[T]he Trustee made *wholesale* changes in personnel, selecting a staff of policy-making confidential employees whose views were compatible with that of the new leadership and in whom the new leadership had confidence." *Id.* (emphasis added). In the Local's account, Indurante's principal liability was his association with "the Ligurotis reign," a liability he shared with most of the other business agents.

Indurante counters that the Local's true agenda under the trusteeship was the elimination of Italian–Americans. Indurante has submitted affidavits from three of his former

co-workers, who allege that during the trusteeship members of management made comments that confirm such a bias. According to one former business agent, about three weeks after McCormick was appointed to his position at the Local, "McCormick stated that all the Italians were going to be fired." This agent reports: "McCormick also stated all the Italians were nothing but mobsters and gangsters." Br. of Pl.-Appellant A38. The Local concedes that McCormick played a role in the decision to fire Indurante. Another former business agent states: "In June, 1993, Trustee Burke told me that the plans were 'to get rid of all the Italians.'" *Id.* at A37. It is undisputed that Zero encouraged Burke to fire Indurante when Burke headed the Local and that Burke refused to do so.

In a third affidavit, a former union organizer describes a confrontation he had with Gerald Zero on February 20, 1995, when Zero, then still the trustee, was campaigning to become the elected head of the Local, and the former organizer had returned to his position as a truck driver:

> Zero appeared at the Preston [Trucking Company] ... entered the drivers' room, where there were about 16 drivers present, and began passing out campaign literature and talking about his election slate. I told him that all of the drivers were on company time and that he was not allowed to campaign for office. Zero kept talking, saying that it was his day off. I told him that the Company did not want union campaigning on their time. He then told me "the days of the goombahs are over."

*Id.* at A44. This former organizer declared that "I and several other drivers of Italian descent were offended by this remark." *Id.* (One meaning of "goombah" is "mafioso." Another is "trusted associate." *See* 1 *Historical Dictionary of American Slang* 932–33 (Jonathan Evan Lighter ed., 1994); *New Dictionary of American Slang* 175 (Robert L. Chapman ed., 1986).)

■ Indurante does not argue that he has presented the sort of evidence of discrimination that in itself entitles him to take his case to a jury without disproving the Local's stated rationale for firing him—evidence "that the person or persons with the power to ...

fire ... [Indurante] were animated by" illegal bias. *Venters v. City of Delphi,* 123 F.3d 956, 972 (7th Cir.1997). In his brief, he summarizes the question presented as "whether Plaintiff has created an issue of material fact regarding *pretext* on the part of the Defendant Local 705 so as to preclude summary judgment." *Id.* at 7 (emphasis added). This indicates that on appeal Indurante is relying on " 'evidence from which a rational factfinder could infer that the [Local] lied about its proffered reason[ ] for his dismissal.' " *O'Connor v. DePaul Univ.,* 123 F.3d 665, 670 (7th Cir.1997) (quoting *Courtney v. Biosound, Inc.,* 42 F.3d 414, 424 (7th Cir.1994)).

In a footnote in his reply brief, Indurante suggests that he is not confining his case to pretext. He observes that "this Court may contemplate the evidence presented under any method of proof it deems appropriate." Reply Br. of Pl.-Appellant 1 n. 1; *cf. id.* at 13. True enough. But this footnote is not an argument, and the point comes too late in a reply brief. *See Kauthar SDN BHD v. Sternberg,* No. 97–2795, 1998 WL 388921, at *7 (7th Cir. July 14, 1998).

■ An assertion that certain "discriminatory comments alone ought to have precluded entry of summary judgment in this case" does appear in Indurante's opening brief. Br. of Pl.-Appellant 14–15. This remark could be read as a claim that Indurante had enough evidence to proceed to trial without evidence of pretext. But the assertion is made in passing in the course of a discussion of another point, and it cites as authority a case decided on the grounds of pretext, *Futrell v. J.I. Case,* 38 F.3d 342, 345 (7th Cir. 1994). A perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal. *See Holleman v. Duckworth,* 155 F.3d 906, 911–12 (7th Cir.1998); *United States v. Cusimano,* 148 F.3d 824, 828 n. 2 (7th Cir.1998); *cf. United States v. Andreas,* 150 F.3d 766, 769–70 (7th Cir.1998) (per curiam).

■ If a plaintiff merely emphasizes one method of proof, but the proper result is clear under the other method, we need not rely on procedural niceties and ignore the

obvious. *See, e.g., Robinson v. PPG Indus.,* 23 F.3d 1159, 1164–65 & nn. 2 & 3 (7th Cir.1994). In the present case, however, it is not obvious that the alleged statements of Burke, McCormick and Zero add up to direct proof of discriminatory intent. (We assume that all the statements are admissible; the district court thought Burke's statement was not, but the Local makes nothing of this in this court.) In particular, it is not clear that the comments are "related to the employment decision in question." *Huff v. UARCO, Inc.,* 122 F.3d 374, 384 (7th Cir.1997).

The phrase "related to the employment decision in question" may simply mean that the comments should refer, first of all, to an employment decision, and second, to the same type of employment decision as the plaintiff is challenging. So comments about discrimination in *hiring* may not suffice if the case involves a *discharge. See, e.g., Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1403–04 (7th Cir.1996). But language in other cases goes further, suggesting that the comments should refer to the individual plaintiff's employment decision. *See Venters,* 123 F.3d at 973 ("One can readily infer from these remarks that Ives was not only willing (indeed, inclined) to evaluate employees in terms of his own religious beliefs and standards, but that in Venters' case, he actually did so.").[1] Some decisions arguably rely on the latter proposition. *See, e.g., Geier v. Medtronic,* 99 F.3d 238, 242 (7th Cir. 1996); *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1252–53 & n. 7 (7th Cir.1990) (requiring "evidence of intentional discrimination directed at [the plaintiff]"); *cf. Kennedy v. Schoenberg, Fisher & Newman,* 140 F.3d 716, 724 (7th Cir.1998). To the extent that the remarks ought to refer to Indurante's termination, that would pose a problem for Indurante's case: the remarks of Burke, McCormick and Zero were not made to Indurante and do not mention Indurante or his termination at all. In addition, the statements of Burke and McCormick are not contemporaneous with Indurante's firing; they come about 16 months earlier. In *Geier,* for example, we concluded that comments made

a year prior to a discharge were "not temporally related" to the termination. *See* 99 F.3d at 242; *see also Kennedy,* 140 F.3d at 724 ("The comment was made at least five months before plaintiff's termination and thus was not temporally related to her discharge."). While Zero's purported remark— "the days of the goombahs are over"—does come fewer than five months after Indurante's firing, it was not even made to employees of the Local and does not expressly refer to employment.

■ Perhaps the cited cases are distinguishable, but the relevant case law on this point was not discussed by Indurante. Because Indurante failed to brief the question whether he could have successfully challenged the motion for summary judgment under the direct method of proof, and the answer is not obvious, we do not decide that question. Therefore in what follows we assume that the comments of Burke, McCormick and Zero are merely what the cases have termed "stray remarks"—biased comments "made by the decisionmaker but not related to the disputed employment action." *O'Connor,* 123 F.3d at 671. As such, they "may be relevant to the question of pretext ... even though they do not constitute direct evidence of discriminatory intent." *Id.*

■ Indurante has failed to present enough probative evidence of pretext to require a trial. He has submitted evidence of other biased comments besides the ones discussed above; those other comments are unquestionably just "stray remarks." Taken together, the alleged expressions of hostility toward individuals of Italian heritage are some evidence of pretext. *See Huff,* 122 F.3d at 385–86. These remarks *alone,* however, cannot demonstrate pretext. *Id.* at 385. But Indurante does have another piece of evidence of pretext: not everyone associated with the Ligurotis regime was swept out. Ligurotis' personal secretary, Katina Skoufis, was not only retained, she was promoted to a job as a business agent.

1. We agree with the dissent that *Venters* and the other cases bearing on the need for specific reference to individual plaintiffs may be ambiguous.

However, the absence of such a specific reference here, where the other facts are quite inconclusive, must obviously be significant.

We have never held that a discrimination case must go to a jury if a plaintiff is able to supplement stray remarks with any other probative evidence whatsoever. In the present case, the retention of Skoufis is the only added piece of probative evidence relevant to pretext, and that is not enough to defeat summary judgment. There were 38 business agents at the start of the trusteeship. Nine of the agents retired or quit. Twenty-seven of the other 29 were fired. (Eleven of the 27 were of Italian descent.) Two were retained, and Skoufis was promoted. A rational jury could not conclude that there was anything less than a wholesale purge of the Ligurotis regime. Indurante claims that Skoufis, as Ligurotis' personal secretary, "surely must also have been an adherent to the 'Ligurotis system.' Indeed a personal secretary would likely be the most loyal of adherents, and one who is privy to all manner of confidentialities." Br. of Pl.-Appellant 27. But this is all just speculation. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336–37 (7th Cir.1991). If Indurante had submitted *evidence* that Skoufis and the two business agents who were retained were among the most enthusiastic backers of the Ligurotis regime, this would be a very different case. But Indurante does not deny that he backed the Ligurotis regime, and he has presented no evidence that the very few employees who were retained were also Ligurotis backers. So the retention of Skoufis does not contribute significantly to Indurante's case. Indurante did present other evidence relevant to preliminary issues in his case, but that evidence is not relevant to the issue of pretext. *See Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 738 (7th Cir.1998).

AFFIRMED.

ILANA DIAMOND ROVNER, Circuit Judge, dissenting.

Against the backdrop of considerable evidence that Indurante and most of his colleagues lost their jobs as the result of a top-to-bottom house cleaning in Local 705, Indurante's claim of national origin discrimination may not seem particularly strong. Yet, he does have evidence (which we are obligated to credit on summary judgment) that two highly-placed union officials, McCormick and Burke, independently spoke of a plan to terminate all of the Italian–Americans, as well as the pronouncement by Zero, the trustee and future head of the Local, that "the days of the goombahs are over." These remarks, all uttered by individuals who at one time or another were decisionmakers, readily support the inference that bias against Italian–Americans may have played a role in the decision to discharge Indurante. Whether Indurante has cited these remarks as direct evidence of discrimination, *see, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 270–73, 109 S.Ct. 1775, 1801–02, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring), or as evidence that the nondiscriminatory reasons that the Local has articulated for his discharge are pretextual, *see McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981), in the end is immaterial; either way, the remarks establish a fact question as to the real reason for Indurante's termination.

My colleagues write these comments off as "stray remarks," *see Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804–05 (O'Connor, J., concurring), because they did not mention Indurante, did not forecast his individual demise, were substantially separated in time from his discharge, and in the case of Zero's ethnically-charged reference to "the days of the goombahs" being over, because they were not made to employees of the Local and did not expressly refer to employment. When two decisionmakers reveal that there is a plan in the works to get rid of the Italian–Americans, the omission to mention the plaintiff or his discharge in particular would seem to be a minor point—there is no dispute, after all, that Indurante is Italian–American, was perceived as such, and that he was indeed terminated.[1] That McCormick

---

[1] I am distressed to see my opinion for the court in *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir.1997), cited for the proposition that re-marks of this kind must specifically refer to the individual plaintiff's employment situation in order to constitute direct evidence of discrimina-

and Burke uttered these remarks sixteen months before Zero fired Indurante is a more salient observation, but one addressed to the ultimate weight of this evidence rather than to whether it is stray or on point. The fact is, some plans take a good while to carry out. Zero's own remark five months after Indurante's termination could be understood as confirmation that the mission had at last been accomplished; to the extent the content or context of his comment render it ambiguous, sorting out its meaning is not a task for the court on summary judgment. *Huff v. UARCO, Inc.,* 122 F.3d 374, 384 (7th Cir. 1997), citing *Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir.1990).

I find myself unable to agree, therefore, that these remarks are too remote from the discharge decision to entitle Indurante to a trial. I see no reason why, as a matter of law, a factfinder could not infer that Indurante's discharge in October 1994 was simply the belated culmination of the purge of Italian–Americans that Burke and McCormick had foretold the year before.

tion. *Ante* at 367. It certainly is true that the remarks at issue *Venters* did focus on the plaintiff and forecast her discharge in particular, *see* 123 F.3d at 973–74, but nowhere in that opinion did we suggest that more generalized remarks would not constitute direct evidence of discrimination. Indeed, I am aware of no case from this circuit suggesting that a remark akin to "We're going to fire all of the Blacks," or "We're not going to hire any women" would not amount to direct evidence of discrimination solely because it does not single out the plaintiff for individual mention. *Venters* itself describes direct evidence of discrimination as "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria," *id.* at 973; these examples quite clearly fit that definition, as do the types of remarks that Indurante relies on here.